OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Gianna D. Brown, filed May 15, 2007. On June 28, 2005, Steven Sheppeard filed a Complaint for Divorce against Brown, and the parties were granted a divorce on December 5, 2005. Brown was designated the residential parent and legal custodian of the parties' minor child, Madison A. Sheppeard, born *Page 2 
February 23, 2002. On August 22, 2006, Brown filed a Motion to Modify Parenting Time and Responsibilities, seeking to eliminate Sheppeard's Monday visitations with Madison. On September 26, 2006, Sheppeard filed a Motion to Modify Parenting Time and Responsibilities, seeking to modify his parenting time to accommodate his work schedule, or alternatively, to be designated the residential parent and legal custodian of the child. Sheppeard also sought to have Brown found in contempt for interfering with his parenting time and visitation rights.
 {¶ 2} Sheppeard is a truck driver, and his truck is in Columbus, Ohio. In April, 2006, he married Jennifer Sheppeard, who has two children of her own, ages seven and three. Jennifer works as a dental assistant. A consent agreement exists between Brown and Jennifer which prohibits contact between them. Jennifer allegedly violated the agreement by accompanying Sheppeard to Brown's apartment during a visitation exchange.
 {¶ 3} Brown does not work. She has two other daughters, ages 13 and seven. Following her divorce, she lived with Chris Rutherford for a time. Rutherford was arrested for domestic violence following a dispute at Brown's home, at the time Brown's three daughters were home sleeping.
 {¶ 4} On December 20, 2006, following a hearing, the Magistrate issued a Decision on the parties' motions. Testifying at the hearing were Sheppeard, Brown, Stephanie Kiefer, Sheppeard's sister, Randi Sheppeard, Sheppeard's mother, and Jennifer Sheppeard. The Magistrate's decision provides that the court, "affords little weight and credibility to Gianna's testimony. * * * Gianna did interfere with visitation and did violate the court order, so as to warrant a finding of contempt and punishment by the court." The Magistrate imposed a fine of $250.00 upon Brown. The Magistrate further concluded, "it is clear that Gianna did not honor *Page 3 
and facilitate visitation and companionship rights, nor would she be likely to do so in the future." The Magistrate noted that a Guardian ad Litem was appointed, and his "report concludes that the best interests of the child would be best served by the current custody arrangement. The guardian ad litem in his report also can be said to conclude this was a close call because he also found that there are indications that a custody change might already be appropriate."
 {¶ 5} In making its conclusions of law, the Magistrate determined, "this court should not change the parenting status of this child without a showing that either the custodian's situation has changed to the detriment of the child or that the child's situation has changed from the time the last custody decision was made. It is found Gianna's interference with visitation is a substantial change of circumstance. * * * Steven has proven, by a preponderance of the evidence, that the harm likely to be caused by a modification of custody would be outweighed by the advantages." The Magistrate then designated Sheppeard as the legal custodian and residential parent of Madison.
 {¶ 6} On December 21, 2006, Brown filed objections to the Magistrate's Decision. On December 22, 2006, the trial court adopted the Magistrate's Decision. On March 14, 2007, Brown filed amended objections to the Magistrate's Decision. On May 2, 2007, the trial court suspended the $250.00 fine imposed upon Brown for contempt, "since she was not afforded the opportunity to purge," and the trial court overruled Brown's remaining objections.
 {¶ 7} In overruling Brown's objections, the trial court noted, the "credible evidence presented at the hearing which took place before the Magistrate on December 13, 2006, does suggest that Ms. Brown prioritized her dislike for Mr. Sheppeard over that which was in her *Page 4 
daughter's best interest, which was to allow her father to be a meaningful part of her life, all of which the credible evidence suggests that Ms. Brown continuously opposed. The credible evidence solicited from the trial which took place on December 13, 2006 suggests that Ms. Brown lacks the maturity to make decisions which are in her daughter's best interest, even if they don't serve Ms. Brown's personal interests."
 {¶ 8} Brown asserts four assignments of error. Brown's first assignment of error is as follows:
 {¶ 9} "THE TRIAL COURT ERRED IN FINDING THE REQUISITE CHANGE OF CIRCUMSTANCES OCCURRED ALLOWING FOR A DETERMINATION OF THE BEST INTEREST OF THE CHILD IN CHANGING CUSTODY TO THE APPELLEE."
 {¶ 10} "`The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.' A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious." Haynes v. Haynes (Nov. 13, 1998), Montgomery App. No. 16992.
 {¶ 11} Our analysis begins with R.C. 3109.04(E)(1)(a) which provides: "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on the facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, [or] the child's residential parent, * * * and that the modification is necessary to serve the *Page 5 
best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * * unless a modification is in the best interest of the child and one of the following applies:
 {¶ 12} "(i) The residential parent agrees to a change in the residential parent * * *
 {¶ 13} "(ii) The child, with the consent of the residential parent * * * has been integrated into the family of the person seeking to become the residential parent.
 {¶ 14} "(iii) The harm likely to be caused by a change in environment is outweighed by the advantages of the change of environment to the child."
 {¶ 15} Regarding the change of circumstances requirement, "`* * * R.C. § 3109.04 requires only a finding of a "change in circumstance" before a trial court can determine the best interest of the child in considering a change of custody. Clearly, there must be a change ofcircumstances to warrant a change of custody, and the change must be a change of substance, not a slight or inconsequential change.'"Travis v. Travis, Clark App. No. 2006 CA 39, 2007-Ohio-4077, quotingDavis v. Flickinger (1997), 77 Ohio St.3d 415, 417, 674 N.E.2d 1159,1997-Ohio-260 (emphasis in original).
 {¶ 16} "The Supreme Court in Davis also stated that `in determining whether a "change" has occurred, we are mindful that custody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have a wide latitude in considering all the evidence before him or her * * * .'" Id.
 {¶ 17} "The requirement that a parent seeking modification of a prior decree allocating parental rights and responsibilities must show a change of circumstances is purposeful: "`The clear intent of [R.C.3109.04(E)(1)(a)] is to spare children from a constant tug of war between *Page 6 
their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the child a `better' environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment.'" Fisher v. Hasenjager, Slip Opinion No.2007-Ohio-5589 (quoting Davis).
 {¶ 18} "`It is well settled that a custodial parent's interference with visitation by a noncustodial parent may be considered a `change of circumstances' which would allow for a modification of custody."Wilburn v. Wilburn (2001), 144 Ohio App.3d 279, 760 N.E.2d 7, quoting Mitchell v. Mitchell (1998), 126 Ohio App.3d 500, 710 N.E.2d 793.
 {¶ 19} At the hearing before the Magistrate, Brown testified, "I don't know of one occasion where I've ever denied him [visitation]. I can think of 100 where he's never showed up, but not one that I've ever denied him visitation." When asked about specific dates of denied visitation, Brown repeatedly stated that she never denied Sheppeard his time with Madison. Brown refused to allow Randi, Jennifer or Stephanie pick up Madison for Sheppeard, stating that she did not want them "at my door."
 {¶ 20} Sheppeard admitted that he missed several of his Monday visitations due to his work schedule. According to Sheppeard, however, he did not see his daughter at all for a period of three to five months, beginning in March, 2006. Sheppeard testified, "[Brown] would deny me, or she would just, she wouldn't answer the door, or she would have Mr. Rutherford answer the door and say that they wasn't there." When asked how many times his visitation was denied, Sheppeard responded, "Several times, but on paper that I can prove, four or five." Shepeard testified that he contacted the sheriffs department four or five times for assistance *Page 7 
when picking up Madison, and that he maintained copies of the police reports that were generated. Sheppeard also testified that he tried to call his daughter "constantly" on the phone, but that Brown "would either say Maddie is outside playing, I'll have her call you back, or she's eating, or a variety of reasons, or have Mr. Rutherford answer the phone, they're not there, things like that." Sheppeard stated that Maddie never returned his calls.
 {¶ 21} Sheppeard stated that in April of 2006, he went to Brown's residence at his scheduled visitation time, and Brown told him that Maddie was attending school at that time. When asked why he did not know that Madison was in school, Sheppeard responded, "I didn't even know she was attending school of this year. I was told that she was not." Further, three or four times, according to Sheppeard, he went to the school to pick up Maddie at the designated time, and she was not there. Brown would then arrive at the school with Madison, having not called Sheppeard to advise him of her absence. Finally, Sheppeard stated that, since he filed his motion for a change of custody, he has received his regular visitation.
 {¶ 22} Sheppeard's testimony was somewhat contradicted by that of his mother, sister and wife, in that the witnesses testified that they saw the child during the period of time that Sheppeard asserted that Brown denied him visitation. Stephanie testified that, in July, 2006, she and her husband, as a favor to Shepperd, transported Madison home after her visitation with Sheppeard. Randi testified that, sometime between May and August, 2006, she also took Madison home for Sheppeard following visitation. Jennifer testified that August 18, 2006 was the first date that Sheppeard saw Madison in a three month period, but then she stated that she waited while Sheppeard dropped Madison off following visitation on June 17, 2006. During redirect, Jennifer refreshed her recollection with an outline she made of Brown's visitation *Page 8 
denials. According to Jennifer, Brown denied Sheppeard his scheduled visitation rights on the weekends of March 3 and 31, April 14 (which was the weekend she and Sheppeard were married), May 12 and 26, July 21, and August 4. Jennifer also stated that Brown denied Sheppeard's Monday visitations on March 6 and April 3.
 {¶ 23} While Sheppeard's and his witnesses' testimony is not entirely consistent as to the number of missed visitations, and the dates upon which they occurred, it is clear, as the Magistrate and trial court correctly determined, that Brown repeatedly denied visitation. Brown did not provide any evidence to rebut the testimony of Sheppeard and his family, other than her own denials, which the trial court clearly did not believe. Finally, once Sheppard retained an attorney and filed his motion, Brown became cooperative, suggesting that Brown knew her past denials of visitation were not in Madison's best interest. On this record, the trial court did not err in finding a change of circumstances pursuant to R.C. 3109.04. Brown was not honest, she repeatedly denied visitation and the court was free to conclude she would fail to cooperate in the future. Brown's first assignment of error is overruled.
 {¶ 24} Brown's second assignment of error is as follows:
 {¶ 25} "THE COURT ERRED IN FINDING IT WAS IN THE BEST INTEREST OF THE CHILD TO CHANGE CUSTODY TO THE FATHER."
 {¶ 26} R.C. 3109.04 sets forth the factors that a court must consider in determining a child's best interest as follows:
 {¶ 27} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 28} "(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and *Page 9 
responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 29} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 30} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 31} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 32} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 33} "(g) Whether either parent has failed to make all child support payments, including arrearages, what are required of that parent pursuant to a child support order under which that parent is an obligor;"
 {¶ 34} "(h) Whether either parent or any member of the household of either parent has been convicted of or plead guilty to domestic violence, child abuse or neglect;
 {¶ 35} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 36} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 37} "`An appellate court will not reverse a trial court's determination concerning parental rights and custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof `Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts *Page 10 
sought to be proven.'" Miller v. Greene County Children's ServicesBoard, (2005), 162 Ohio App. 3d 416, 833 N.E.2d 805, 2005-Ohio-4035.
 {¶ 38} In determining Madison's best interest, the trial court determined that Brown's arguments regarding a change of circumstance and Madison's best interest "are interrelated in this case." Citing R.C.3109.04(F)(1)(f) and (i), the trial court determined that "Ms. Brown has continuously and willfully denied Mr. Sheppeard's parenting time * * *, she is also far less likely to honor and facilitate Court approved parenting time rights or visitation and companionship rights for Mr. Sheppeard in the future." The court further determined that Madison "has a greater opportunity to have positive interaction with and interrelationships with friends and relatives while residing with her father, all of which will be beneficial to her future development."
 {¶ 39} Brown argues that the trial court failed to consider the wishes of the child in its determination to change custody. Brown further states that "there is no evidence as to the child's adjustment to each home." According to Brown, Madison feels insecure with Jennifer and has never been away from Brown for a significant amount of time. Brown avers that Sheppeard's mental and physical health is an issue that the trial court should have considered, since Sheppeard allegedly attempted suicide, abuses alcohol and has heart and/or kidney problems. Brown denies that Sheppeard is more likely than she is to facilitate parenting time. She states that the fact that Sheppeard's child support was once in arrears "should have been a strong factor" in her favor and against Sheppeard.
 {¶ 40} Brown further states that the trial court penalized her for her past relationship with Rutherford, due to incidents of domestic violence, but ignored the fact that Jennifer *Page 11 
violated the consent agreement between her and Brown. Finally, Brown argues that the trial court "relied primarily on the allegation of denied visits to determine the best interest of the child."
 {¶ 41} Sheppeard argues in his brief that he has a supportive family for Madison, and that Brown's allegations regarding Madison's insecurity around Jennifer are "mere speculation." Regarding Madison's wishes, Sheppeard argues that if Brown "had a problem with the Guardian or the court not interviewing a four year old, she could have called the Guardian to testify or requested a formal in camera interview. * * * To raise this issue on appeal is improper." Sheppeard continues that his alleged attempted suicide, problems with alcohol and health issues are "unsubstantiated and adequately rebutted" by Sheppeard's own testimony. Regarding Jennifer's violation of the consent agreement, Sheppeard states that Jennifer's violation thereof "is presently the subject of a pending Objection."
 {¶ 42} Regarding past incidents of domestic violence during her relationship with Rutherford, Brown testified that charges were filed against Rutherford, and that she signed a statement asserting that she needed police protection for herself and her family. She read a statement to the court in which she wrote that Rutherford grabbed her by her neck. Brown stated that Rutherford continued to live with her after the charges were filed. According to Brown, "As him being on the lease still at that time, I had no control over him not being there." Brown stated that she later asked him to move out, "partially" because of the pending custody dispute. Sheppeard testified that he had recently seen Rutherford's truck in Brown's driveway, suggesting that Brown and Rutherford may be still involved.
 {¶ 43} Sheppeard testified that he was fired from one job for failing an alcohol test, but *Page 12 
that he does not currently have a problem with alcohol. Sheppeard stated that his mental health is "fine," and that his physical health is "fair, good." He stated that, while he was found in contempt for not paying child support earlier in March, 2006, he is now current in his obligation. Sheppeard stated that he did not have a heart attack but had kidney stones.
 {¶ 44} Stephanie testified that her family and Sheppeard's get together two or three times a week. She stated that she has observed Jennifer and Madison together, and that Jennifer is "very loving and caring toward Maddie as if she were one of her own biological children. * * * And seems to have Maddie's best interest at heart at all times." Randi testified that she hosts Sunday dinner at her house every week for approximately 12 family members, and that she takes Madison to church. Randi used to provide licensed daycare for children, including Madison, at her home, and she is available to help Sheppeard with her care. Randi testified that Brown refused to allow Madison to stay with Randi if Jennifer's children were also at her home. Jennifer testified that her two children and Madison get along well together.
 {¶ 45} We agree with Sheppeard that Brown should have requested an in camera interview with Madison if she wanted the court to consider Madison's wishes regarding custody, although it is likely that the child was too young to understand her own best interest.
 {¶ 46} While Brown testified that she disagreed with the Guardian's determination that Madison's life would be more stable and consistent with Sheppeard, she failed to call the Guardian as a witness, his report is not part of the record before us, and Brown cannot take issue with his report on appeal.
 {¶ 47} Having throughly reviewed the record before us, we conclude that there is evidence therein that satisfies the relevant R.C. 3109.04
factors. Further, it was the role of the *Page 13 
court to determine the relative weight to assign each factor, in relation to the others, when determining Madison's best interest. The trial court clearly believed Sheppeard and the testimony of his witnesses regarding Brown's interference with Sheppeard's visitation, as well as their testimony regarding Madison's interactions and relationships with Sheppeard, Jennifer, and Sheppeard's family. The only evidence to the contrary was Brown's testimony, which the trial court did not believe, and it is not for us to weigh the credibility of conflicting testimony. Since Sheppeard provided clear and convincing evidence that it is in Madison's best interest that he be awarded custody of her, and there being no abuse of discretion, Brown's second assignment of error is overruled.
 {¶ 48} Brown's third assignment of error is as follows:
 {¶ 49} "THE TRIAL COURT ERRED BY FINDING THE HARM LIKELY TO BE CAUSED BY THE CHANGE IN CUSTODY IS OUTWEIGHED BY THE ADVANTAGES OF SUCH CHANGE"
 {¶ 50} Having determined that a change in circumstances occurred and a change in custody is in Madison's best interest, we finally analyze whether "the harm likely to be caused by a change in environment is outweighed by the advantages of the change of environment to the child." Brown argues, "Any problems [she] might have had with a violent boyfriend or denying visitation had been rectified by the time of the hearing." Sheppeard notes that the trial court not only determined that Brown denied Sheppeard his visitations, but also that Brown would be likely to do so in the future.
 {¶ 51} Brown's testimony that she continued a relationship with Rutherford after his arrest for domestic violence, and Sheppard's testimony, if believed, suggesting that Rutherford *Page 14 
and Brown may still have a relationship, reveal that Brown minimizes the issue of domestic violence, whereas there is no evidence of domestic violence at Sheppeard's home. Finally, the trial court clearly believed, after observing the witnesses, that Sheppeard will be more likely than Brown to follow court ordered visitation in the future. Brown's argument that "any problems she may have had * * * denying visitation had been rectified" suggests an admission on her part that she did in fact deny visitation, despite her denials. Brown's testimony that she refuses to allow Madison's grandmother, aunt and step-mother to pick up Madison, and her refusal to allow Randi to care for Madison if Jennifer's kids are present, suggest an intent on Brown's part to isolate Madison from Sheppeard's family. Given Brown's past and present conduct, the advantages of the change of custody outweigh any harm that may be caused, and Brown's third assignment of error is overruled.
 {¶ 52} Brown's fourth assignment of error is as follows:
 {¶ 53} "THE TRIAL COURT ERRED IN MODIFYING CUSTODY AS A PUNISHMENT FOR CONTEMPT."
 {¶ 54} "A court may hold a party in contempt who fails or refuses to comply with its orders and may impose such penalties as are reasonable and just. (Internal citation omitted). A violation of visitation orders is punishable by contempt." Culberson v. Culberson (1978),60 Ohio App.2d 304, 397 N.E.2d 1226. R.C. 3109.04 does not permit a modification of custody based upon a finding of contempt. Id.
 {¶ 55} The Magistrate found Brown to be in contempt and fined her $250.00. Later, the trial court determined that Brown's financial sanction of $250.00 for violating the visitation schedule had been improperly imposed. As discussed above, the trial court's decision makes *Page 15 
clear that it modified custody because a change of circumstances occurred, the modification was in Madison's best interest and any harm caused by the change was outweighed by the advantages. Nothing in the record suggests the proposition that the modification was based solely upon the contempt finding. Since Brown's fourth assignment of error lacks merit, it is overruled. Judgment affirmed.
 WOLFF, P.J. and BROGAN, J., concur. *Page 1