[Cite as *Thomas v. Thomas*, 2011-Ohio-2977.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

NADRA THOMAS                              :

    Plaintiff-Appellant               :       C.A. CASE NO.    2009 CA 88

v.                                        :       T.C. NO.    07DR0957

CARL E. THOMAS, Jr.                       :       (Civil appeal from Common Pleas
                                    Court, Domestic Relations)
    Defendant-Appellee               :

                                           :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___17th___ day of ___June___, 2011.

. . . . . . . . . .

JAMES N. GRIFFIN, Atty. Reg. No. 0015917, 8 N. Limestone Street, Suite D, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellant

JOHN C.A. JUERGENS, Atty. Reg. No. 0037120, 1504 N. Limestone Street, Springfield, Ohio 45503
    Attorney for Defendant-Appellee

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of Nadra Thomas, filed September 18, 2009.  Ms. Thomas and Carl Thomas were granted a divorce on February 11, 2008, and Ms. Thomas was granted custody of the couple's only child, A.T., who was born on

January 6, 2004. Mr. Thomas was granted visitation with A.T. every weekend from 6:00 p.m. on Friday until the following Sunday at 6:00 p.m., and he was ordered to pay $50.00 a month in child support. On November 18, 2008, Mr. Thomas filed a "Motion for Change of Custody." After a lengthy hearing, the trial court granted the motion.

{¶ 2} In ruling for Mr. Thomas, the trial court noted that Ms. Thomas has resided with her boyfriend, David Paris, in an apartment in Springfield since August, 2008. At the time of the hearing, she was employed as an aid at the Early Childhood Education Center, having been there for approximately four years, and she had no criminal history. The court further noted that Ms. Thomas graduated from Springfield South High School in 2002, and she has been married one time, to Mr. Thomas. In 2008, her gross earnings were $13,099.00. Ms. Thomas does not have a driver's license.

{¶ 3} The court noted that Mr. Paris is 53 years old and receives disability for heart problems. In 1990, Mr. Paris was convicted of assaulting his then two year old son and was sentenced to eight to 15 years in prison. An appellate court later reversed this conviction and Mr. Paris was released in 1999. The court noted that it "will not consider that conviction since the Federal Court has dispensed with it. The Court will, however, consider other issues involving David Paris which are relevant to this Court's determination as to what is in [A.T.'s] best interest."

{¶ 4} The court noted that Mr. Paris has six children with four women, "and the credible evidence in this case suggests that he has a relatively poor relationship with [A.T.], despite the Plaintiff's contentions to the contrary. In January, 2009, [A.T.] was removed from Ms. Thomas' residence by the Clark County Department of Job and Family Services after [A.T.] sustained an

ankle injury" and asserted that Mr. Paris had thrown him. A.T. was placed with Mr. Thomas, and a comprehensive safety plan was developed. Formal charges were not filed against Mr. Paris and the matter was eventually closed. The court noted that it "designated Mr. Thomas as the temporary legal custodian of [A.T.] and granted Ms. Thomas visitations and parenting time while the child was at pre-school (where she works also) and also at other times, providing that David Paris was not present. Interestingly enough, however, Ms. Thomas declined the opportunity to spend more parenting time during the pendency of this matter with [A.T.] because the order prohibited David Paris from being present and she disagreed with the implementation of such a temporary order. In fact, the credible evidence in this case suggests that Ms. Thomas has consistently chosen her relationship with Mr. Paris, a man who she has only known a little more than a year, over her relationship with her only child, [A.T.]"

{¶ 5} The court further noted that at "the hearing herein, on more than one occasion, Ms. Thomas indicated that she would not at all abide by any Order of this Court which prohibits David Paris from being in the presence of [A.T.]. The credible evidence suggests that [A.T.] is afraid of David Paris and, in this Court's opinion, for good cause, and despite the foregoing, Ms. Thomas has acknowledged that she will in no way cooperate in insuring that Mr. Paris is not in [A.T.'s] presence."

{¶ 6} The court noted that it was of concern to the court that Ms. Thomas has "involved multiple men into [A.T.'s] life, knowing very little about them." It was significant to the court that Ms. Thomas stated that she did not learn of Mr. Paris' history until the start of testimony herein. The court concluded that Mr. Paris "does not serve as a positive influence upon [A.T.] and specifically that said child is likely to incur harm while in the presence of Mr. Paris and the

Court further finds that is highly unlikely that Ms. Thomas will insure the child's safety while Mr. Paris is present, and in fact, she is likely not to report any safety issues of the child for fear of losing custody, despite the likelihood of harm being caused to [A.T.], while in Mr. Paris' presence."

{¶ 7}  The court summarized the testimony of Carla Byrd and her boyfriend, Wayne Martin, Ms. Thomas' former roommates after her divorce.  Both witnesses testified that Ms. Thomas "did a poor job of cleaning and feeding [A.T.] and kept a filthy room which she shared with the child, which was infested with cockroaches.  They both testified that Ms. Thomas entertained multiple men of questionable character for sexual purposes while in the presence of [A.T.]."  The court noted that it found Byrd's and Martin's testimony to be "relatively credible, despite Ms. Thomas' contention to the contrary."  The court noted that the Guardian ad Litem ("GAL") testified that Ms. Thomas' current residence is adequately clean and spacious "for [A.T.'s] needs, however, in the Court's opinion, such has not always been the case, and it is not likely to be when this case is over."

{¶ 8}  The court further noted that Mr. Thomas resides in subsidized housing and pays no rent, and that he receives $375.00 per month in food stamps.  Mr. Thomas delivers newspapers on foot, and the court noted that his income is "minimal."  The court found that credible evidence suggests that Mr. Thomas' residence is "adequately clean and spacious so as to provide for all of [A.T.'s] needs."

{¶ 9}  It was significant to the court that A.T. and Mr. Thomas "have an extremely close and loving relationship to each other and it is, in this Court's opinion, healthy in nature.  Mr. Thomas has, to [his] credit, committed himself to be a good parent and properly provide for

[A.T.]." The court noted, however, that Mr. Thomas "has a past worthy of this Court's concern. Specifically, Mr. Thomas has by several women, a total of seven children, the oldest of whom is 33 years of age. The second youngest child, next to [A.T.], is 19 years of age. Mr. Thomas himself is 50 years old." The court determined that Mr. Thomas has "various child support arrearages from his other child support obligations for some of his other children," and that he accordingly has had his driver's license suspended. The court noted that Mr. Thomas is in arrears regarding his obligation to A.T., and that he owed the approximate sum at the time of the hearing of $672.00. On the final day of testimony, Mr. Thomas presented evidence of recent efforts to begin paying support to regain his license. The court noted that Ms. Thomas has not been ordered to pay child support during the pendency of the proceedings while Mr. Thomas has temporary custody.

{¶ 10} The court's entry provides, "It has been this Court's experience that in virtually every custody case, credibility is an issue, however, in this case, during the pendency of these proceedings and during the multiple days of testimony, it is clear to this Court that both of the parties in this case are willing to disregard the truth in an effort to gain custody of their son. To this end, both of the parties have provided testimony which is simply not believable by this Court."

{¶ 11} Specifically, the court cited Mr. Thomas' denial, in discovery and in his interview with the GAL, of any significant criminal activity. During the course of testimony, it was revealed that, in 1994, Mr. Thomas was convicted, in Franklin County, of attempted gross sexual imposition, a misdemeanor of the first degree, and he served five months of a six month jail term. Mr. Thomas testified that he had a stroke in 2007 which caused him to forget his conviction.

The court found Mr. Thomas' testimony regarding his memory loss not credible and noted that while "both the conviction and the failure to disclose the conviction are significant issues which * * * weigh against Mr. Thomas, they are far from the only determining factors which this Court must consider in order to determine what is in [A.T.'s] best interest."

{¶ 12} The court further noted that Ms. Thomas testified that she "has resided at her current residence for approximately four years when, in fact, it was eventually disclosed that she has only resided there approximately nine months. Likewise, she testified, on repeated occasions, that [A.T.] did not spend significant parenting time with Mr. Thomas in excess of the every weekend visitation which he was afforded" in the parties' final decree. The court noted, "In fact, the credible evidence suggests that Mr. Thomas had [A.T.] in his possession much more than Ms. Thomas did" after the divorce.

{¶ 13} While the court found that "both parties have failed to disclose or have deliberately misrepresented facts," there is "a significant difference in the parties, in that in this Court's opinion, Mr. Thomas has truly committed himself to the difficult task of raising a five year old child in today's world and Ms. Thomas, on the other hand, has unfortunately not made such a commitment and is highly unlikely to do so in the immediate future."  The court noted that A.T. has been treated for ADHD and asthma,  and it was significant to the court that Mr. Thomas has taken A.T. to all of his doctors appointments, even after Ms. Thomas  was awarded custody.  According to the court, Ms. Thomas "has rarely, if ever, accompanied [A.T.] to any of his prior doctor visits and the evidence suggests she is uninformed and relatively unconcerned about [A.T.'s] health issues. * * *  Similarly, she denies that [A.T.] has ADHD issues despite the fact that the child's doctor has been treating him for this condition.  She has not expressed

enough interest in the child's health to make an appointment to see the doctor to discuss his diagnosis in this regard, despite the fact that she disagrees with it." The court noted that credible evidence was presented that Ms. Thomas smoked cigarettes in A.T.'s presence, despite his asthma. The court concluded that Mr. Thomas is more likely to tend to A.T.'s health care needs. The court noted that A.T., along with other children, contracted an intestinal bacterial infection at preschool, for which he was being treated at the time of the hearing, and that he was unable to return to the preschool until "he has two clean test results." According to the court, Mr. Thomas "is doing a good job in taking care of all of the child's current medical needs." The court further noted that Mr. Thomas had registered A.T. for kindergarten, and that he "will be more attentive to [A.T.'s] educational needs than Ms. Thomas has in the past, despite her contentions to the contrary."

{¶ 14} According to the court, A.T. "was not particularly well adjusted to his mother's home and community" after the divorce, and "in fact, the credible evidence suggests that he spent more time with Mr. Thomas after the divorce was granted and actually became more adjusted to his home and neighborhood. The child was relatively well adjusted a[t] preschool. The credible evidence suggests that [A.T.] is likewise more likely to develop healthy relationships with friends, relatives and others while residing with his father, all of which will assist him in his future development."

{¶ 15} Regarding Mr. Thomas' health, the court noted that in addition to his stroke, Mr. Thomas has "heart issues," lupus and arthritis, but that "none of his physical conditions are debilitating to the point that they adversely impact his ability to parent [A.T.]." The court's entry provides that the "Court has not been provided with sufficient evidence to establish any

significant health related issues for Ms. Thomas. Likewise, the Court has not been provided with sufficient evidence to establish that either of the parties or the minor child has experienced any mental health issues, except as otherwise set forth herein."

{¶ 16} Regarding the GAL, the court noted that she expressed concerns "as to whether Mr. Thomas would honor and facilitate visitations and parenting time for Ms. Thomas if he gained custody." The court noted that Mr. Thomas indicated that Ms. Thomas should be given visitation rights but that Mr. Paris should not be present during the visitations. The court indicated in its entry that it agreed that "it is in [A.T.'s] best interest that David Paris not be present during Ms. Thomas' visitations with [A.T.]." It was "interesting" to the court that Ms. Thomas testified that, were she to retain custody, "she does not favor any visitations for Mr. Thomas." The court noted that the GAL expressed similar concerns regarding Ms. Thomas' intentions to honor and facilitate court approved parenting rights. The court concluded that Mr. Thomas is more likely than Ms. Thomas to facilitate parenting time, noting that although Ms. Thomas initially granted Mr. Thomas extensive parenting time, "this degree of cooperation significant[ly] ended when Ms. Thomas became involved with David Paris."

{¶ 17} The court noted that neither party has been convicted of criminal offenses that involved an act which resulted in a child being abused or neglected. It further noted that neither party has indicated an intention to reside outside of the State.

{¶ 18} The court noted that the GAL initially recommended that Ms. Thomas retain custody. "Thereafter, in her [second] up-dated report and recommendation, after speaking with Jennifer Carson, the nurse who treated [A.T.] at the hospital and after talking with Karla Byrd and LaMar Martin, Ms. Thomas' former roommates, and also after reviewing Dr. Zainey's

medical records, [the GAL] recommended that A.T. reside with Mr. Thomas and that Mr. Paris not be present for any visitations between Ms. Thomas and [A.T.]." The court went on to note that, after Ms. Thomas was made aware of the GAL's concern regarding Mr. Paris, "she continued to reside with him and declined the opportunity to visit with [A.T.] outside of David Paris' presence."

{¶ 19} The court indicated that, in the course of her initial testimony on May 15, 2009, the GAL became aware for the first time of Mr. Thomas' 1994 conviction, and the court accordingly ordered a third report and recommendation from the GAL limited to the issue of Mr. Thomas' conviction. The GAL testified again on June 18, 2009 regarding her third report, and the court quoted from the GAL's final recommendation in its entry as follows: "At this point, I am not at all confident in Mr. Thomas' credibility. I found it difficult to believe that he suffered memory loss, forgot the conviction and then was able to recall what happened when meeting with me very clearly. Considering the fact that allegations of abuse arose with Mr. Thomas and considering the lack of supporting evidence, I hesitate to accept those allegations. Therefore, at this point I am recommending no change of custody from this Court's order at the time of the parties' divorce."

{¶ 20} The court noted in its entry that it shared the GAL's frustration and concerns. It was significant to the court that the GAL was only present during the hearing while she herself testified, and that she therefore "was not privy to all of the testimony which was presented over the course of this lengthy trial." The court went on to note that, even if it "were to totally discount the testimony of Mr. Thomas (which it is not), for lack of credibility, it is not prepared to discount the testimony of Jennifer Carson, the nurse at Mercy Hospital; [C]arla Byrd and

LaMar Martin, Ms. Thomas' former roommates, or the statements made during the course of trial by Ms. Thomas and Mr. Paris, all of which, when combined, cause this Court great concern. To this end, the Court disagrees with the third and final recommendation made by the [GAL] * * * ."

{¶ 21} The court concluded its analysis by finding that Mr. Thomas met his burden of proof in showing that there has been a change of circumstances of substance justifying a modification of parental rights and responsibilities, and that it is in A.T.'s best interest that Mr. Thomas be designated as the residential parent and legal custodian. Finally, the court found that any harm likely to result from the change in environment is outweighed by the advantages of such change. The court granted Ms. Thomas visitation rights and ordered that she insure that Mr. Paris is not present during visitation. Finally, the court ordered Ms. Thomas to pay child support in the amount of $50.00 a month, and the court terminated Mr. Thomas' child support obligation.

{¶ 22} Ms. Thomas asserts two assignments of error. Her first assignment of error is as follows:

{¶ 23} "THE TRIAL COURT ERRED WHEN IT AWARDED CUSTODY OF THE CHILD, [A.T.] TO HIS FATHER, CARL THOMAS, WHEN THE MOVANT HAD FAILED TO SHOW THAT THERE HAD BEEN A SUBSTANTIAL CHANGE OF CIRCUMSTANCES SINCE THE PARTIES' DIVORCE AND WHEN THE CHANGE OF CUSTODY WAS NOT IN THE CHILD'S BEST INTEREST."

{¶ 24} "'The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through

observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.' A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious." *Haynes v. Haynes* (Nov. 13, 1998), Montgomery App. No. 16992. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable,* * *

{¶ 25} "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Enterprises, Inc. v. River Place Community Redevelopment* (1990), 50 Ohio St.3d 157, 161.

{¶ 26} R.C. 3109.04(E)(1)(a) provides: "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree that a change has occurred in the circumstances of the child, his residential parent, * * * and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * * unless a modification is in the best interest of the child and one of the following applies * * * (iii) the harm likely to be caused by the change of environment is outweighed by the advantages of the change of environment of the child."

{¶ 27} "Regarding the change of circumstances requirement, ' " * * * R.C. 3109.04 requires only a finding of a 'change in circumstance' before a trial court can determine the best

interest of the child in considering a change of custody. Clearly, there must be a ***change*** of ***circumstances*** to warrant a change of ***custody***, and the change must be a change of substance, not slight or inconsequential change.'" *Travis v. Travis*, Clark App. No. 2006 CA 39, 2007-Ohio-4077, quoting *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 417, * * * 1997-Ohio-260 (emphasis in original).

{¶ 28} "'The Supreme Court in *Davis* also stated that "in determining whether a 'change' has occurred, we are mindful that custody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have a wide latitude in considering all the evidence before him or her * * * ." ' Id.

{¶ 29} "'The requirement that a parent seeking modification of a prior decree allocating parental rights and responsibilities must show a change of circumstances is purposeful: " 'The clear intent of [R.C. 3109.04(E)(1)(a)] is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the child a "better" environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a "better" environment.'" *Fisher v. Hasenjager*, Slip Opinion No. 2007-Ohio-5589 (quoting *Davis*).'"

{¶ 30} *Sheppeard v. Brown*, Clark App. No. 2007 CA 43, 2008-Ohio-203, ¶ 15-17.

{¶ 31} Having thoroughly reviewed the record, and deferring to the knowledge the trial court gained through its observation of all of the witnesses, we see no abuse of discretion, and we conclude that the evidence adduced herein supports the trial court's finding of a change of circumstances. We agree with the court that both parties provided testimony that was not

credible as cited above. The court, however, found "relatively credible" the testimony of Carla Byrd and Wayne Martin that they had observed Ms. Thomas with multiple sexual partners in A.T.'s presence, and that she did not maintain a clean home for A.T. According to Ms. Byrd's testimony, Ms. Thomas had "a lot" of male visitors and Ms. Thomas "[w]ould sleep with them while [A.T.] was in the room." Ms. Byrd testified that Ms. Thomas' bedroom "had dirty dishes on the floor with dried up food. I would have to go in there to retrieve the dishes on several occasions. I would have to close her door because it stunk in there." According to Mr. Martin's testimony, A.T. "don't have any business being with his mom, because Carl come in, he stop in, he rush right over, you know, he get a ride and just come right over. * * * I see [A.T.] hugging his dad, I don't see the relationship with his mom that much, except for she like to party. She throws him off on Carl."

{¶ 32} The court also credited the May 15, 2009, testimony of Jennifer Carson, the nurse at Mercy Hospital who treated A.T. for his ankle injury. Ms. Carson testified that A.T.'s injury was not significant and that its source was not apparent. She stated that Mr. Thomas told her that Ms. Thomas' boyfriend had injured A.T., and she was asked, in the course of her direct testimony, if she were to learn that Mr. Thomas lacked credibility, "would that make a difference into your determination onto how the injury occurred?" Ms. Carson responded, "No, because I believed what the child told me more than anything and the way he acted." Ms. Carson read from her notes in the hospital record as follows:

{¶ 33} "A.  00:25 spoke to patient about how injury happened and patient stated, David hurt me. When asked if this was mommy's friend and patient states, yes. Patient appears scared; curled in fetal position and no obvious injury on assessment. Patient states right leg

hurts and maintains eye contact on part of assessment and then closes eyes and curls back to fetal position." Carson stated that her notes later indicated as follows: "Spoke with patient again while dad was on phone with Children's Services and patient states when asked if he likes staying at dad's home on weekend and he states, yes, I like staying with daddy and also states when asked about staying at mom's house, David is mean to me and throws me in living room and makes mommy mean. * * * 01:40, patient more willing to open up and talk and smiles when talking about dad and becomes more withdrawn when discussing mom's house, mom's boyfriend, in parenthesis, David, and just staying at mom's * * *, in general, patient becomes more withdrawn." Ms. Carson stated that she believed A.T. was "scared; probably afraid to say what he thought needed to be said. * * * He very much wanted to be with dad." Finally, Ms. Carson testified that she remembered "specifically that [A.T.] said that David dropped him and he picked him up and dropped him to the floor and I asked him if they were playing, at first that this was just a, playing around and he fell and got hurt. That's exactly what I thought at first. As we got more into the conversation later on when he had more trust towards me, he told me that David threw him in the living room. * * * ."

{¶ 34} As the court indicated, Ms. Thomas has resided with Mr. Paris since August, 2008, and the evidence supports the court's finding that Mr. Paris has a "relatively poor" relationship with A.T. Most importantly, the evidence further supports the trial court's determination that Ms. Thomas has repeatedly chosen her relationship with Mr. Paris over her relationship with A.T. The following exchange occurred in the course of Ms. Thomas' testimony on May 5, 2009:

{¶ 35} "Q. Have you had a chance to observe the [second] Guardian Ad Litem report?

{¶ 36} "A.   Yes.

{¶ 37} "Q.   And are you aware that the Guardian Ad Litem made a recommendation that as long as Mr. Paris continues to reside with Ms. Thomas, [A.T.] should reside with Mr. Thomas, and * * * that Mr. Paris not be present for any visitation between Ms. Thomas and [A.T.]; did you read that?

{¶ 38} "Q.   Yes, I did.

{¶ 39} "A.   So if the Court would adopt that and say that you couldn't have parental rights   if David Paris were present, what would you do?

{¶ 40} "A.   I would fight it, because I don't think that's right.

{¶ 41} "Q.   Would you fight the Court's order?

{¶ 42} "A.   Yes, I would fight it because I don't think that's right.

{¶ 43} "Q.   And you would allow David Paris to be present, even though that would be the Court order; is that right?

{¶ 44} "A.   Yes."

{¶ 45} Ms. Thomas testified as follows on August 4, 2009:

{¶ 46} "Q.   * * * Are you aware that your attorney requested that you have visitations away from the school, additional visitation?   Did you know that he requested Judge Capper to allow you to have additional visitations?

{¶ 47} "A.   Yeah.   It was at the last court hearing.

{¶ 48} "Q.   And that was what, about a month ago or so?

{¶ 49} "A.   Yes.

{¶ 50} "Q.   And the Judge said that would be okay for you to have every other weekend

visits as long as David Paris wasn't there?

{¶ 51} " * * *

{¶ 52} "Q.   Are you aware of that?

{¶ 53} "A. Yes, I was.

{¶ 54} "Q.   Okay.   And how many times has that happened?

{¶ 55} "A.   I didn't go through with that agreement.

{¶ 56} "Q.   You just said no, you don't want to have the visits then if that [is] the condition?

{¶ 57} "A.   I would like visitation but that's not fair that my fiancee can't be there when my fiancé did not do anything to [A.T.].

{¶ 58} "Q.   So, because there was that provision in the Judge's order that Mr. Paris not be allowed to be around you have declined any visits since then?

{¶ 59} "A.   Yes, it's gone on this long, so - -"

{¶ 60} In total, the above evidence, which the trial court credited, establishes that Ms. Thomas exposed A.T.   to multiple sexual partners, in an unclean home, and that, at the time of the hearing, she chose to continue to reside with Mr. Paris, whom A.T. fears and whom A.T. has accused of injuring him, rather than have parenting time with her son.   Ms. Thomas made clear to the court that she would not cooperate with a court order requiring Ms. Thomas to see A.T. in the absence of Mr. Paris.   In other words, based upon the facts that have arisen since the final decree, a change has occurred in the circumstances of A.T.   Given that Ms. Thomas prioritizes her own and Mr. Paris' needs above those of her child, it is in A.T.'s best interest that a modification occur, and we agree with the trial court that any harm to A.T. based upon the

change of environment is outweighed by the advantages of such change.

{¶ 61} Of final note, while Ms. Thomas asserts that the court should consider the fact of Mr. Thomas' conviction against naming him the residential parent, there is no evidence in the record that the victim of the attempted gross sexual imposition was a child or household member. R.C. 3109.04(C). On cross-examination regarding the conviction, counsel for Ms. Thomas referred to the victim as "the lady."

{¶ 62} There being no abuse of discretion, Ms. Thomas' first assigned error is overruled.

{¶ 63} Ms. Thomas' second assigned error is as follows:

{¶ 64} "THE TRIAL COURT ERRED WHEN IT ORDERED THAT THE MOTHER COULD NOT HAVE PARENTING TIME WITH THE CHILD IF DAVID PARIS WAS PRESENT."

{¶ 65} R.C. 3109.051 (A) provides in part, "If a divorce, dissolution, legal separation, or annulment proceeding involves a child and if the court has not issued a shared parenting decree, the court shall consider any mediation report filed pursuant to section 3109.052 of the Revised Code and, in accordance with division (C) of this section, shall make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child and includes in the journal its findings of facts and conclusions of law. Whenever possible, the order or decree permitting the parenting time shall ensure the opportunity for both parents to have frequent and continuing contact with the child, unless frequent and continuing contact by either parent with the child would not be in the best interest of the child."

{¶ 66} Matters concerning parenting time are reviewed for an abuse of discretion. *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144. "The outer bounds set by this section require the court's parenting time decision to ensure that both parents have the opportunity for 'frequent and continuing contact with the child' and to be 'just and reasonable.' R.C. 3109.051(A). To help ensure a just and reasonable decision, paragraph (D) instructs the trial court to consider fifteen specific factors plus any other factor the court finds is in the child's best interest. (citation omitted). These factors include: a child's relationships with [his] parents, * * * the child's and parents' available time; the child's age; the child's adjustment to home, school, and community; the health and safety of the child; * * * and the mental and physical health of all concerned. R.C. 3109.051(D).

{¶ 67} "* * * [W]e must make two observations about our present review. First, finding no evidence to the contrary, we will presume that the court considered each of the paragraph (D) factors. (citation omitted). And second, we will presume, as we must, that the trial court's factual findings are correct. *Quint v. Lomakoski*, 167 Ohio App.3d 124, * * * 2006-Ohio-3041, at ¶ 12." *Schoenfelt v. Schoenfelt*, Montgomery App. No. 23497, 2009-Ohio-6594, ¶ 8-9.

{¶ 68} Our review of the trial court's decision establishes that the trial court considered all relevant statutory factors. As Mr. Thomas correctly asserts, the court's visitation order does not deny Ms. Thomas parenting time with her child. We agree with the trial court's findings that A.T. has a poor relationship with Mr. Paris, with whom Ms. Thomas resides, that A.T. is likely to incur harm in the presence of Mr. Paris, that Ms. Thomas refused to cooperate with a court order designed to protect A.T. from Mr. Paris, and that Ms. Thomas was unlikely to protect A.T.'s safety.

{¶ 69} There being no abuse of discretion, Ms. Thomas' second assignment of error is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

James N. Griffin
John C.A. Juergens
Hon. Thomas J. Capper