[Cite as *Roberts v. Roberts*, 2022-Ohio-284.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | | |
|---|---|---|
| KEVIN ROBERTS | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-23 |
| | : | |
| v. | : | Trial Court Case No. 2017-DR-245 |
| | : | |
| MEGAN ROBERTS | : | (Domestic Relations Appeal) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of February, 2022.

. . . . . . . . . . .

KEVIN ROBERTS, 2975 Stonequarry Road, Dayton, Ohio 45414
        Plaintiff-Appellee, Pro Se

CHARLES A. CLAYPOOL, Atty. Reg. No. 0020855, 130 West Second Street, Suite 1622,
Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Megan Roberts appeals from a judgment of the Miami County Common Pleas Court, which denied her motion for a modification of child custody. Because she failed to demonstrate a change in circumstances in support of her motion, we affirm the trial court's judgment.

## I.    Facts and Procedural History

{¶ 2} Megan and Kevin Roberts were married in 2006 and have two minor children, M.R. and J.R.[1]   On August 18, 2017, Kevin filed a complaint for divorce.   That same day, the parties entered into an agreed order which noted that a prior divorce action filed by Kevin had been dismissed; the order also indicated that the parties would abide by the temporary orders that had been in effect in that action.   Thus, the agreed order granted Kevin temporary custody of the children.   The order also restricted Megan to supervised visitation.

{¶ 3} In October 2017, the parties entered into a separation agreement.   The separation agreement named Kevin as the legal custodian and primary residential parent. No child support was ordered.   Regarding visitation, the agreement stated:

Mother * * * shall be entitled to unsupervised visitation conditioned upon the following:

1. In the event Mother takes the minor children to any health provider including without limitation [p]hysicians, hospitals or mental health providers regarding sexual abuse allegations relating to Father or makes

---

[1] M.R. was born in 2010, and J.R. was born in 2013.

allegations to Children's Services or law enforcement agencies regarding sexual abuse of the children by Father, Father can immediately seek ex parte relief without obtaining service on Mother and the Court has the ability to exercise jurisdiction and rule on the motion without obtaining service on Mother.

{¶ 4} A judgment and decree of divorce incorporating the separation agreement was entered on October 16, 2017.

{¶ 5} In May 2020, the Miami County Child Support Enforcement Agency conducted an administrative review of the child support obligation in this case. A report recommended that Megan be ordered to pay child support in the amount of $183.23 per month. On May 21, 2020, that recommendation was filed with the court. On June 8, 2020, Megan filed a request for a court review of the administrative adjustment. On July 29, 2020, she filed a motion seeking a change in custody. In support of the motion, she alleged Kevin had failed to provide the children with timely medical treatment and that he had caused physical and mental abuse to the children.

{¶ 6} A hearing was conducted on January 14, 2021. Megan was represented by counsel, but Kevin appeared pro se. Megan presented the testimony of Kevin's former girlfriend, Amylynn Cremeans, who lived with Kevin from October 2016 until late 2018. Cremeans testified that her three children had also lived with the couple along with Kevin's two children. She testified that Kevin abused drugs and alcohol during the time they lived together and that he sometimes used these substances when the children were in the home. Cremeans also testified that Kevin subjected her to emotional and physical abuse. Specifically, she testified that Kevin had called her "cunt," "stupid," "bitch," and

"ignorant" in front of the children. Tr. p. 8. She also testified that he had made multiple threats to kill her and that he had choked her on one occasion. Cremeans testified that she had observed Kevin call his son "idiot" and "stupid motherfucker" and that she had also observed him slap the child "upside the head a couple times." Tr. p. 8, 10. She further testified that she had observed Kevin scream at his daughter and call her "stupid" and "retarded." *Id.* Cremeans also averred that she observed Kevin shake the girl on one occasion. Tr. p. 9.

{¶ 7} Cremeans further asserted that, at the outset of their relationship, she had been aware there were allegations that Kevin had sexually abused his children; however, she did not perceive him as a threat to her children. According to Cremeans, because the allegations had been made, Kevin would leave the bathroom door open whenever he bathed the children. She further testified that, toward the end of their relationship, she "started questioning" Kevin about the abuse allegations because there was one occasion when she "walked past the bathroom and [she] stopped because the door was shut and something just told [her] to open the door." Tr. p. 24. She continued, stating that she "swung the door open fast" and observed Kevin in front of the bathtub while his daughter was standing in the bathtub facing him. *Id.* Cremeans testified both Kevin and the child had been "startled" and "jumped" when the door was opened. *Id.* She further testified that Kevin had "glared" at her. *Id.*

{¶ 8} On cross-examination, Cremeans admitted that, after the relationship ended, she had been involved in a Facebook "smear campaign" of Kevin's new girlfriend. She also admitted that Kevin's reaction during the bathroom incident had not been unreasonable since she abruptly opened the bathroom door. However, she felt her

actions had not given Kevin a reason to "glare" at her. Finally, she stated that she had had no contact with Kevin during the two years preceding the hearing.

{¶ 9} Megan also testified at the hearing. She testified that she had observed Kevin hold a knife to their son's neck in 2015. She also testified that in December 2018, Kevin asked her to take the parties' daughter to the doctor because the school nurse indicated the child had a urinary tract infection. According to Megan, she took the child to the doctor the following day. Megan testified that the nurse practitioner began to examine the child and then asked Megan to step out of the room. After the nurse practitioner finished the examination, she informed Megan that the child had "disclosed sexual abuse," and the nurse practitioner was required to call the police and file a report. Tr. p. 48. Megan testified that she was instructed to take the child to Dayton Children's Hospital, where they met with a social worker. Megan testified that the matter was "taken to the prosecutor," but she did not know anything further about the case. Tr. p. 49.

{¶ 10} Megan also testified there was a lack of communication between Kevin and her and that she "sometimes has difficulty getting ahold of [the] children to tell them goodnight." Tr. p. 50. She further testified that the children's school "often need[s] to contact [her] because they are unable to reach Kevin." *Id.* She testified that teachers had informed her that the children had missed school work and some classes, but the teachers accepted late work. She also asserted that the children missed part of their classes one day because Kevin did not take their negative COVID test results to the school. From Megan's testimony, it appears she actually had possession of the COVID test results and that she tried to contact Kevin in order to let him take them to the school; when she was unable to contact Kevin, she texted pictures of the test results to the

teachers and the children were able to attend their later classes. She also testified that she has another son, and the son's father had custody. Finally, she testified that the children had expressed "a strong desire" to live with her. Tr. p. 53.

{¶ 11} Finally, Megan testified that she attended a January 2020 basketball practice for her son at which she and Kevin's current wife got into a verbal altercation. Megan testified the incident ended when Kevin prevented his wife from hitting Megan.

{¶ 12} Kevin testified that he provided the school with a copy of the children's negative COVID tests the same day as Megan. He also testified that there were a few missed classes and school work, but those were related to issues with home technology and on-line schooling during COVID. He further testified that his son earned straight A's and was otherwise doing well in school. He averred that he and his daughter's teacher agreed to hold the child back in kindergarten because she displayed an issue with maturity, given that she was the youngest child in the class. Kevin testified that his daughter was on track at the time of the hearing and doing well in school.

{¶ 13} Kevin admitted to the drug use that occurred with Cremeans. He also acknowledged that he continues to smoke marijuana, but testified he only does so when the children are with Megan. He further testified that he stopped most of his alcohol use after he sold his business and got remarried. Kevin denied abusing either Cremeans or his children. He also denied the allegations of sexual abuse and stated that the issue had been disposed of during the prior divorce hearing.

{¶ 14} Following the hearing, the magistrate denied Megan's motion for custody. The magistrate further ordered Megan to pay $256 per month in child support. Megan filed objections to the magistrate's decision. The trial court overruled her objections and

adopted the magistrate's decision.

{¶ 15} Megan appeals.

## II.    Analysis

{¶ 16} Megan asserts the following as her sole assignment of error:

THE TRIAL COURT'S FINDING THAT THERE WAS NO SUBSTANTIAL CHANGE OF CIRCUMSTANCES IS NOT SUPPORTED BY THE RECORD WHICH RESULTED IN DENYING A CHANGE OF CUSTODY

{¶ 17} Megan's argument in support of her assignment of error centers on her claim that neither she nor the trial court were aware, at the time of the divorce decree, of the facts to which Cremeans testified.

{¶ 18} In Ohio, once parental rights and responsibilities are allocated, the focus is on stability for the child.   *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997), citing *Wyss v. Wyss*, 3 Ohio App.3d 412, 416, 445 N.E.2d 1153 (10th Dist.1982). To that end, R.C. 3109.04(E)(1)(a) provides:

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.   In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior

shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

(i) The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.

(ii) The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶ 19} "In considering a motion for a change of custody, the trial court must first determine whether there has been a change of circumstances of the child or the residential parent since the prior court order." *Wilburn v. Wilburn*, 144 Ohio App.3d 279, 286, 760 N.E.2d 7 (2d Dist.2001), citing *Wyss* at 414. "A change of circumstances must be found before the trial court weighs the child's best interest." *Id.*, citing *Zinnecker v. Zinnecker*, 133 Ohio App.3d 378, 383, 728 N.E.2d 38 (1999). "The purpose of requiring a finding of a change in circumstances is to prevent a constant relitigation of issues that have already been determined by the trial court." *Id.*, quoting *Zinnecker* at 383.

{¶ 20} The first claimed change in circumstances, as set forth in the testimony of both Cremeans and Megan, involved allegations of sexual abuse of J.R. by Kevin. Specifically, Megan testified J.R. made an allegation of sexual abuse during a December 2018 doctor's visit, and Cremeans testified to the bathroom incident, which she indicated had occurred at the end of her relationship with Kevin.

{¶ 21} With regard to Megan's testimony, the magistrate noted that she presented no evidence that any charges had been filed or that Children's Services had intervened with Kevin's household. As such, the magistrate did not consider this information to constitute a change in circumstances. Indeed, the magistrate further noted that the separation agreement permitted Kevin to seek ex parte relief from the court if Megan made any allegations of sexual abuse of the children by Kevin.[2] Likewise, the magistrate did not find merit in what she termed as Cremeans's "speculat[ion] that Kevin had sexually abused J.R. based upon his glaring at her when she burst into the bathroom while J.R. was getting a bath." We find no basis upon which to disagree with the magistrate's assessment or the trial court's acceptance of that assessment.

{¶ 22} Next, Megan argues neither she nor the court was aware at the time of the decree of divorce that Cremeans had witnessed drug and alcohol abuse or the use of vulgarities and physical abuse directed at the children by Kevin. In this regard, the magistrate noted that Kevin denied abusing his children. The magistrate also noted that, while Kevin candidly admitted that he continued to use marijuana, he denied doing so when he had the children. Further, the magistrate noted that Kevin testified he stopped most of his drinking after he sold his business, and there was no evidence of addiction. More importantly, there was no evidence to suggest the children had been impacted by Kevin's use of marijuana and alcohol.

{¶ 23} The magistrate specifically stated that, other than the altercation between Megan and Kevin's new wife, the allegations against Kevin either were known at the time

---

[2] Although the pleadings in the prior divorce action are not before us, the pleadings and evidence in this record permit an inference that Megan had raised such allegations in the prior case and that those allegations were discredited.

of the divorce, were not substantiated, or involved a determination of witness credibility. It appears the magistrate chose to credit Kevin's testimony over that of Cremeans or Megan. From our review of the record, we cannot say that the trial court erred by adopting the magistrate's conclusion.

{¶ 24} Finally, despite finding no change in circumstances, the magistrate also went on to determine whether a change in custody would be in the best interest of the children. The magistrate found the evidence did not support a finding that it was in the children's best interest that Megan be named their primary residential parent and legal custodian. Megan does not dispute this finding, and from our review, we cannot say that the trial court abused its discretion by adopting the magistrate's best interest determination. The children had been in Kevin's custody since 2016 and had lived in the same home since they were born. M.R. was in fourth grade and was doing very well in school. J.R. was in first grade and doing well. The record does not contain evidence that necessitated a finding that Kevin abused the children. Finally, Kevin permitted Megan more parenting time than required by the decree.

{¶ 25} " 'The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.' A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious." (Citation omitted.) *Thomas v. Thomas*, 2d Dist. Clark No. 2009-CA-88, 2011-Ohio-2977, ¶ 24.

**{¶ 26}** Having reviewed the record, and deferring to the knowledge the magistrate had gained through observation of all of the witnesses, we conclude that the evidence adduced herein supported the trial court's finding of no change of circumstances. Additionally, although not necessary to the disposition of this case, a review of the best interest of the children did not indicate the need for a change of custody. Having found no abuse of discretion, we overrule Megan's assignment of error.

### III.    Conclusion

**{¶ 27}** The judgment of the trial court is affirmed.

. . . . . . . . . . . . .


DONOVAN, J. and WELBAUM, J., concur.


Copies sent to:

Kevin Roberts
Charles A. Claypool
Hon. Stacy M. Wall