**In re D.M.**

[Cite as *In re D.M.*, 196 Ohio App.3d 50, 2011-Ohio-3918.]

Court of Appeals of Ohio,
Twelfth District, Clermont County.

No. CA2010–11–088.

Decided Aug. 8, 2011.

Anita Bechmann, guardian ad litem.

D.M., appellee, pro se.

Michael A. Kennedy, for appellant.

HUTZEL, Judge.

{¶ 1} Appellant, T.M., the father, appeals a decision of the Clermont County Court of Common Pleas, Juvenile Division, granting custody of his son, D.M., appellee, to the child's biological mother.

{¶ 2} D.M. was born in December 2004. Although divorced, the parties were living together at the time of their son's birth. In June 2005, the parties separated when the mother moved out of the father's home with D.M. A year later, the mother moved for custody of D.M. Eventually, the parties entered into a shared-parenting plan, which was incorporated into a shared-parenting decree in January 2008. The plan set out a two-week visitation rotation that gave each party equal parenting time. It is undisputed, however, that as written, the shared-parenting plan was never followed by the parties because of the father's work schedule. As a result, the father had parenting time during the evening once or twice weekly and occasionally on the weekends. In June 2008, the mother moved back into the father's home; however, later that year, she moved out again with D.M. and went to live with her boyfriend, Thomas H.

{¶ 3} In September 2008, the father started dating Ciera S. The mother has known Ciera since Ciera was four years old; the mother and Ciera's mother have been friends for over 15 years. In the fall of 2008, Ciera started staying at the father's house with her two children (a five-year-old daughter and a one-year-old son). She and her children moved into the father's house in January 2009. Ciera and the father both testified that D.M. has a good relationship with Ciera's children. Ciera is unemployed; her driver's license is currently suspended; she used to have, but claims she no longer has, a substance-abuse problem (marijuana); and she denied intentionally harming herself in order to obtain pain medication. On her 21st birthday (September 2008), she was arrested for driving without a license and for drug abuse.

{¶ 4} It is undisputed that as soon as the father started dating Ciera, the dynamics of his relationship with D.M. began to change. The father testified in May 2009 that he had been denied visitation with his son for over six months. The father explained that whenever he would call the mother to ask her if he

could pick up D.M., the mother would tell him, "No, he doesn't want to go. I'm not forcing my son to go with you." Initially, the father stopped driving to the mother's home to pick up D.M., as this would have been in vain. Eventually though, he started going to the mother's home with a police officer. Yet he was never able to pick up his son, because the mother would not allow it. As a result, each time, the father was reduced to visiting with his son for only a few minutes.

{¶ 5} The father testified that he once tried to leave the mother's home with D.M. when a police officer was present. The mother yelled and screamed, D.M. became very upset, and on the officer's advice, the father put his son down and left without him. The father also testified that he stopped calling his son in the evenings because even when his calls were answered, the father was not able to speak with his son.

{¶ 6} The mother testified that until the fall of 2008, the father was a good father. However, in the fall of 2008, the father started to be less involved in D.M.'s life. Between November 2008 and January 2009, the father did not see D.M. at all, as he did not call or come to her house. When the father tried again to exercise visitation in January 2009, D.M. would refuse to go with his father because he was afraid of him. The mother testified that she respected her son's wishes and that she did not force him to go with his father if he did not want to. The mother denied doing anything to prevent the father from having parenting time with D.M. and in fact stated that she wanted the father to have a relationship with D.M. The mother testified that after he started dating Ciera, the father's house changed (in that it now had cigarette butts and sex toys); however, D.M.'s bedroom had not.

{¶ 7} Thomas, the mother's boyfriend, testified that the relationship between the father and D.M. started to change after the father started dating Ciera. Thomas testified that when asked, D.M. states that he does not want to go with his father. Thomas denied that the father's visitation was obstructed by the mother. Rather, the mother is protecting her son, which includes telling the father that he will not be able to leave with D.M. if the child says he does not want to go. Thomas testified that he has a good relationship with D.M.

{¶ 8} The mother also testified that she was not willing to let D.M. go with the father because she had no means to contact the father. The mother testified that whenever she tried to call the father, he would either not answer her calls or would cuss at her. On the rare occasions when she could leave a voicemail, the father would not call her back. In November 2008, the mother placed 80 calls to the father one day, and 115 calls the next day. The mother admitted that she "would blow [the father's] phone up" by calling him constantly so that they could talk about their son. The mother saw nothing wrong with calling the father constantly until he would either call back or "does what's right by his son." The

father explained that he does not return the mother's calls because he typically cannot get a word in as the mother screams and cusses at him. The father testified that the mother's incessant calling is harassing and has caused problems at his work.

{¶ 9} The mother is bipolar, for which she takes medication. After D.M.'s birth, she worked at Subway but was terminated for missing work. She is currently unemployed and is financially supported by Thomas. She has a criminal history that includes substance-abuse offenses both before and after the child's birth. Prior to D.M.'s birth, the mother was convicted of operating a vehicle while under the influence ("OVI") in 2002, was addicted to methamphetamine in 2001 or 2002 but no longer uses the drug thanks to treatment paid for by the father, and was convicted of attempted manufacturing of methamphetamine.

{¶ 10} Since D.M.'s birth in December 2004, the mother's criminal record includes an OVI conviction in 2007, a drug-abuse conviction in 2007 (marijuana possession), a theft conviction in 2007, and a probation violation in 2008 for testing positive for marijuana in August 2008. The mother denied having a marijuana problem and stated that her random drug screens after August 2008 have been negative. The mother and Thomas both have suspended driver's licenses and also have ignition-interlock devices in their cars. The mother also has restricted license plates.

{¶ 11} Testimony was presented regarding Ciera's 21st birthday party, which took place at the father's house. Doris S., a friend of the mother, attended the party. She testified to observing several underage people consuming alcohol. She also observed the father and Ciera snort some orange powder and some white powder. After drinking two or three beers, Doris left the party and went to a bar. Although she was outraged by the activities taking place at the father's house, she did not call the police. D.M. was not at his father's house that day. The father testified that although there was alcohol at the party, there were no underage people and no drugs. The father denied snorting anything at the party. The father testified that he does not like drugs and that he spent a lot of money on the mother's substance-abuse treatment. The father testified that he had to ask Doris to leave the party, as she was intoxicated and causing a disturbance.

{¶ 12} The father works full-time at King's Island, starting his days at 5 a.m. during the summer, and at 6 a.m. during the winter. He has no criminal history. D.M. has his own bedroom in the father's house. The father testified that he loves his son, has a good relationship with him, and wants to spend a lot of time with him. The father testified that if he had custody of D.M., his mother, who adores D.M., would help in the mornings if needed. Likewise, Ciera would help if needed.

{¶ 13} The reason the shared-parenting plan was not followed by the parties was the father's work schedule. As a result, until September 2008, the father had parenting time during the evening once or twice weekly and occasionally on the weekends. The father testified that although D.M. could have stayed at his house overnight and be cared for by his paternal grandmother in the mornings, it never happened because the mother was adamantly opposed to D.M. being cared for by a paternal relative other than the father.

{¶ 14} In November 2008, the mother moved to modify the shared-parenting plan. In March 2009, the father moved to terminate the shared-parenting plan and sought custody of D.M. The father also filed a contempt motion alleging that the mother had denied him parenting time on several occasions in March 2009. Following a hearing on the parties' motions in May 2009, the magistrate terminated the shared-parenting plan and granted custody of D.M. to the mother. The magistrate did not rule on the contempt motion.

{¶ 15} The father filed objections to the magistrate's decision. He also filed a new contempt motion alleging that the mother had denied him parenting time on four occasions in July 2009. On October 28, 2009, the juvenile court found the father's objections to be well taken, appointed a guardian ad litem ("GAL") for the child, and remanded the case to the magistrate. On November 16, 2009, the magistrate found the mother in contempt for denying the father parenting time on four occasions in July 2009.

{¶ 16} In 2010, the father filed his third contempt motion alleging that the mother had denied him parenting time on four occasions in January 2010. The GAL filed two reports. In her first report (filed in February 2010), the GAL noted that (1) the father was not receiving parenting time, because the child refused to go with his father; (2) the mother felt that the father should have no parenting time, because the child was afraid of his father; (3) the father felt that the mother had alienated his son from him; (4) the child attended therapy at Cincinnati's Children Hospital; and (5) according to the therapist, parenting-time could resume as long as there was a transition to the previous parenting-time schedule and that the mother was not a part of that transition. The GAL stated that it was in the best interest of the child to resume parenting time with the father immediately.

{¶ 17} By temporary order signed by the parties, the juvenile court granted parenting time to the father on alternating weekends and overnight visitation on alternating Wednesdays, effective April 9, 2010. The father subsequently filed his fourth contempt motion, alleging that the mother had denied him parenting time on April 9, 2010.

{¶ 18} In her second report (filed in August 2010), the GAL stated that the father had been denied parenting time on at least four occasions between April 9

and July 4, 2010. "Further, several incidents have happened during the parenting time that have caused distress for [D.M.]. On one weekend, mother called [the child's] cell phone numerous times asking if he needed or wanted to come home. At some point, the child went down on the floor, covered his head with his hands and curl[ed] up into the fetal position. The father turned off the child's cell phone. The mother came to the father's home at 11:30 pm and brought the police. [D.M.] had to be awakened to talk with the police. The police have been sent to the father's house on other occasions during the child's visit."

{¶ 19} The GAL further stated that (1) to address the mother's concerns, the GAL asked the father and Ciera to take a drug test; both immediately complied with the request; the results were negative for both; (2) according to the mother, since the visits have resumed, D.M. is not sleeping well; and according to the therapist, the mother reports an increase in aggressive behavior and agitation for D.M.; and (3) the GAL's review of telephone conversations between the father and/or Ciera and the mother revealed the mother's disdain for the juvenile court's orders and her determination to interfere with the father's parenting time. In her recommendations, the GAL stated:

{¶ 20} "[I]t is in the best interest of [the child] to spend at least half of his time at Father's home. Further, if Mother continues to interfere with this parenting time, or continues to place [the child] in the middle of her conflicts, the Court should consider granting custody to Father. Mother's refusal to follow a Court Order raises concerns for her ability to provide for the best interest of her child. If Mother cannot control her behaviors, a psychological evaluation may be warranted. [T]ime is essential in this case. There is no doubt that the child is in distress. A resolution of the custody/parenting issues will be helpful in decreasing his anxiety."

{¶ 21} On August 12, 2010, the juvenile court found the mother in contempt for denying the father parenting time on six occasions between January and July 2010. On October 13, 2010, the juvenile court terminated the shared-parenting plan, granted custody of the child to the mother and named her the residential parent, and granted the father parenting time. In addressing the best-interest factors under R.C. 3109.04, the juvenile court noted the mother's mental health and substance-abuse history, the mother's repeated unwillingness to cooperate with the father with regard to his relationship and parenting time with their son, the mother's unwillingness to cooperate with the court's orders, and the fact that the mother had denied the father parenting time.

{¶ 22} The juvenile court also found, based on its August 2010 in camera review of the child (then five years old), that D.M. "was the most uncommunicative, anxious, and tense child that this Court has met under these circumstances. It is abundantly clear that the constant, and escalating, conflict between the

parties has taken a tremendous toll on this young child. \* \* \* [Further], the child is suffering stress and anxiety as a result of this pending proceeding." As a result of being found in contempt for denying the father parenting time, the mother was also sentenced by the juvenile court to 30 days in jail.

{¶ 23} The father appeals, raising one assignment of error:

{¶ 24} "The trial court erred in designating the mother residential parent and legal custodian of the minor child."

{¶ 25} A juvenile court's custody decision will not be reversed absent an abuse of discretion. *A.S. v. D.G.*, Clinton App. No. CA2006–05–017, 2007-Ohio-1556, 2007 WL 959902, ¶ 39. "Abuse of discretion" implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. When applying the abuse-of-discretion standard, an appellate court's role is to ascertain whether the award of custody is supported by competent and credible evidence. *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 674 N.E.2d 1159. The discretion granted to a juvenile court in custody matters should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned. *A.S.* at ¶ 39.

{¶ 26} Because the father moved to terminate the shared-parenting plan, his motion was governed by R.C. 3109.04(E)(2)(c). *In re A.B.*, Butler App. No. CA2009–10–257, 2010-Ohio-2823, 2010 WL 2488522. Under R.C. 3109.04(E)(2)(c), a juvenile court may terminate a shared-parenting plan if it determines that the plan is not in the best interest of the child. Upon terminating a shared-parenting plan, a juvenile court must then "issue a modified decree for the allocation of parental rights and responsibilities" in accordance with the best interest of the child, "as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made." R.C. 3109.04(E)(2)(d).

{¶ 27} In determining the best interest of a child, a juvenile court is required to consider "all relevant factors" found in R.C. 3109.04(F)(1) including (1) the wishes of the child's parents; (2) if the juvenile court has interviewed the child in chambers, the wishes and concerns of the child; (3) the child's relationship with the parents, siblings, and any other person who may significantly affect the child's best interest; (4) the child's adjustment to home, school, and community; (5) the mental and physical health of all parties; (6) the parent most likely to honor and facilitate court-approved parenting time, visitation, and companionship rights; (7) any failure of a parent to promptly pay a child-support payment, when required to do so by the courts, and (8) whether one of the parents has continuously and willfully denied the other parent's right to parenting time. R.C. 3109.04(F)(1)(a) through (i).

{¶ 28} Upon a thorough review of the record, we find that the juvenile court abused its discretion in granting custody of D.M. to the mother.

{¶ 29} We are mindful that the mother has been the primary caregiver of the child since he was born, as she emphasizes in her appellate brief. "Although it is not a codified factor under R.C. 3109.04(F)(1), Ohio courts have held that a party's role as the primary caregiver is nevertheless a relevant factor when determining the best interest of a child. This factor is, however, not given presumptive weight over other relevant factors." (Citations omitted.) *Terry L. v. Eva E.,* Madison App. No. CA2006–05–019, 2007-Ohio-916, 2007 WL 646254, ¶ 17. Further, after terminating a shared-parenting plan, custody of a child is to be determined as if making an initial custody determination. See *Kelly v. Kelly* (Mar. 8, 2002), Miami App. No. 2001–CA–52, 2002 WL 360656.

{¶ 30} As the Second Appellate District stressed in *In re Custody of Harris,* 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, "children have certain rights, including 'the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles.'" Id. at ¶ 11, quoting *Thomas v. Freeland* (Oct. 10, 1997), Greene App. No. 97–CA–06, 1997 WL 624331.

{¶ 31} In the case at bar, both parents stand on an equal footing under several of the statutory factors in R.C. 3109.04(F)(1). The juvenile court found that (1) both parents want custody of their son, (2) D.M. has a deep emotional attachment to both parents and has a positive relationship with both Thomas and Ciera, the parents' respective significant others, and (3) D.M. is seemingly well adjusted in either parent's home and is involved in age-appropriate school and extracurricular activities. R.C. 3109.04(F)(1)(a), (c), and (d). The juvenile court also found that the factors under R.C. 3109.04(F)(1)(g), (h), and (j) were not applicable. The record supports the court's findings.

{¶ 32} In addressing the best-interest factors under R.C. 3109.04, the juvenile court also noted the mother's mental-health and substance-abuse history, the mother's repeated unwillingness to cooperate with the father with regard to his relationship and parenting time with their son, the mother's unwillingness to cooperate with the court's orders, and the fact that the mother had denied the father parenting time. R.C. 3109.04(F)(1)(e), (f), and (i). Despite these findings, amply supported by the record, the juvenile court granted custody of D.M. to the mother.

{¶ 33} In *Flickinger,* 77 Ohio St.3d 415, 674 N.E.2d 1159, the Ohio Supreme Court stated:

{¶ 34} "In today's society that fully admits the need for parenting by both parents, each parent should have full involvement in a child's life, where possible and desired by the parent. When one parent begins to *cut out another parent*, especially one that has been fully involved in that child's life, the best interest of the child *is* materially affected. * * * Clearly, preventing a child from spending time with a caring and loving parent, as well as the hostility and friction generated by the disputes that arise over such issues, may be considered harmful to the best interest of the child." (Emphasis sic.) Id. at 419–420.

{¶ 35} We find that it was arbitrary for the juvenile court to grant custody of D.M. to the mother, a parent (1) who has repeatedly denied the father his parenting time, (2) who was twice found in contempt by the juvenile court for denying the father's parenting time on ten occasions in the span of a year (July 2009 to July 2010), (3) who is determined to interfere with the father's parenting time as noted by the GAL in her second report, (4) who has in fact interfered with the father's parenting time and whose interference has caused great distress to the child, as reported by the GAL in her second report, and (5) who, in the juvenile court's own words, "has demonstrated repeatedly her unwillingness to not only cooperate with the father concerning his relationship and parenting time with the child, but her unwillingness to cooperate with this Court's Orders."

{¶ 36} While the juvenile court properly terminated the shared-parenting plan, we hold that the court erred in granting custody of D.M. to the mother. The father's assignment of error is well taken and sustained.

{¶ 37} The judgment is reversed, and the cause is remanded for further proceedings.

Judgment reversed
and cause remanded.

POWELL, P.J., and HENDRICKSON, J., concur.