[Cite as *In re S.M.T.*, 2012-Ohio-1745.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 97181

## IN RE: S.M.T.

## Minor Child

## [APPEAL BY FATHER, B.F.]

## JUDGMENT:
## REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. CU 07111618

BEFORE: Stewart, P.J., Sweeney, J., and Cooney, J.

RELEASED AND JOURNALIZED: April 19, 2012

**ATTORNEY FOR APPELLANT FATHER**

Mark S. Shearer
8193 Avery Road, Suite 201
Broadview Heights, OH    44147


**ATTORNEY FOR APPELLEE MOTHER**

John V. Heutsche
John V. Heutsche Co., L.P.A.
Hoyt Block Building, Suite 220
700 West St. Clair Avenue
Cleveland, OH    44113-1274


**GUARDIAN AD LITEM**

Thomas Kozel
P.O. Box 534
North Olmsted, OH    44070-0534

MELODY J. STEWART, P.J.:

{¶1} Appellant-father, B.F., appeals from a juvenile division order that denied his motion to determine custody of child, S.M.T., and named appellee-mother, M.C., the residential parent. Father argues that the court abused its discretion by naming the mother as the residential parent because the mother's conduct toward the father in preventing or obstructing visitation made her unfit as a parent and the court further erred by refusing to allow the child's guardian ad litem to testify to his recommendation that the father be named residential parent.

I

{¶2} Before addressing the merits of the appeal, we note that the mother did not file an appellate brief. App.R. 18(C) gives us the discretion to "accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action."

{¶3} Some appellate decisions have incorrectly referred to App.R. 18(C) as imposing reversal as a "sanction" for an appellee's failure to file a brief. *See, e.g.*, *State v. Reigelsperger*, 2d Dist. No. 95-CA-90 (Mar. 29, 1996); *Birthelmer v. Birthelmer*, 6th Dist. No. L-83-046 (July 15, 1983). This is imprecise. App.R. 18(C) does not impose a form of appellate default judgment where the court of appeals can reverse solely because the appellee failed to file a brief. Reversal is warranted only if the arguments in the appellant's brief reasonably appear to support a reversal. Contrast this with a different provision of App.R. 18(C) that allows the court of appeals to "dismiss" an appeal as a

consequence of the appellant's failure to file a brief. The Ohio Supreme Court has found that dismissal for failure to file an appellant's brief *is* a "sanction." *Hawkins v. Marion Corr. Inst.*, 28 Ohio St.3d 4, 501 N.E.2d 1195 (1986).

{¶4} Our discretion extends only to accepting the father's statement of the facts as correct. We choose to do so in this appeal, but we necessarily consider those facts in conjunction with the father's legal arguments to determine the correctness of the court's judgment.

II

A

{¶5} The father's motion for modification of parental rights and responsibilities is controlled by R.C. 3109.04(E)(1)(a). That section states:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.

{¶6} "While R.C. 3109.04 does not define what constitutes a change of circumstances, courts have generally held the phrase to mean 'an event, occurrence, or situation which has a material and adverse effect upon a child.'" *In re M.D.D.*, Butler App. No. CA2009-06-170, 2010-Ohio-326, at ¶ 22, quoting *Preece v. Stern*, Madison App. Nos. CA2008-09-024 and CA2008-12-029, 2009-Ohio-2519, at ¶ 12 (other internal quotation omitted). *See also Rohrbaugh v. Rohrbaugh*, 136 Ohio App.3d 599, 604-605,

737 N.E.2d 551 (7th Dist. 2000). The change of circumstances "must be a change of substance, not a slight or inconsequential change." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶7} The father argued that a change of circumstances existed because of the mother's repeated interference with his visitation rights. It is beyond question that a custodial parent's interference with visitation by a noncustodial parent may be considered a change of circumstances that would allow for a modification of custody. *C.G. v. C.L.*, 8th Dist. No. 90341, 2008-Ohio-3135, ¶ 13. *See also Sheppeard v. Brown*, 2d Dist. No. 2007 CA 43, 2008-Ohio-203; *Scaffold v. Scaffold*, 9th Dist. No. 04CA0068-M, 2005-Ohio-4546; *Holm v. Smilowitz*, 83 Ohio App.3d 757, 773, 615 N.E.2d 1047 (4th Dist. 1992). This is because the court recognizes the importance of a child having a strong relationship with both parents, so an award of custody in favor of the parent "who is most likely to foster a relationship between the child and the other parent is in the child's best interests." Borris, *Interference with Parental Rights of Noncustodial Parent as Grounds for Modification of Child Custody*, 8 No. 1 DIVLIT 1 (1997). When a custodial parent so obstructs the visits between the child and the noncustodial parent, then the best interest of the child is no longer being served.

{¶8} Interference with visitation is particularly aggravating when the custodial parent wilfully ignores a visitation order and obstructs the child's visits with the noncustodial parent. The noncustodial parent has few options in such cases. Ohio does not provide for civil damages resulting from one parent's interference with the visitation

rights of another (R.C. 2307.50 permits civil damages for "child stealing," but that statute "does not create a civil action for one parent against the other parent who commits a child stealing crime against the parent's own child.")  To be sure, a noncustodial parent whose visitation rights have been interfered with can initiate contempt proceedings against the offending parent.  Unfortunately, motions of this type are costly to prosecute, particularly where, as here, the parents live in different states.  And as a practical matter, motions to hold the custodial parent in contempt rarely offer immediate relief to the noncustodial parent.  It took almost 18 months for the court to decide the father's motion for change of custody in this case, and as we shall see, the primary argument against a change of custody is that the child is so settled with the mother that a change in custody is not in her best interest.  The courts must not allow a custodial parent to benefit from that parent's own misconduct in interfering with custody.

B

**{¶9}** S.M.T. was born out of wedlock, and the mother became the custodial parent. Both mother and father lived in Ohio at the time of the child's birth, and the mother allowed the father to visit the child even though there was no visitation order in place. The voluntary visitation ended when the mother learned that the father had married and shortly before the father, an officer in the United States Marine Corps, was deployed to Iraq for combat duty.  Knowing that he would be posted to a remote area, off-base, with very limited access to telephones or the internet, father wished to visit with the child before his deployment.  The court granted visitation.  During his deployment, the father

tried to call the child every few days or so, despite his limited ability to make telephone calls and the obvious difficulty in engaging a three-year-old in conversation.

{¶10} When the father returned from Iraq, he was stationed at Marine Corps Base Camp Lejeune, in North Carolina. The mother and child then lived in West Virginia, but neither party took steps to transfer jurisdiction of the matter to a different court under the Uniform Child Custody Act. When the father tried to visit with the child, the mother repeatedly hampered or interfered with his attempts, prompting him to file a motion for an order naming him as the residential parent and legal custodian of the child. The father is now stationed at Marine Corps Base Quantico, in Virginia.

{¶11} The father detailed a significant history showing how the mother interfered with his visitation rights. That history was fully corroborated by the court's own findings of fact. In a clear case of understatement, the court concluded that "there was significant evidence presented regarding ongoing parental conflict directed from mother to father." The court found that the mother showed an "unwillingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights without court order." She had shown herself "at times to be mean, vindictive and unforgiving, all to the detriment of the father." Although the father had attempted to cooperate and appease the mother, the court found "at times, there was no appeasing mother's harassment and rages." Her "actions and verbal assaults upon the father in the presence of the child are clearly degrading and serve to diminish his parental status for her parental gain." The mother's vitriol against the father was not isolated. A West Virginia guardian ad litem for the

child noted that the mother's act of "[s]creaming at the father in front of [the child] serves no purpose other than to decrease love and respect for her father, and cause her to be confused about her relationships with these adults." A psychological therapist who treated the child likewise told the West Virginia guardian ad litem that the child "has been exposed to a great deal of hostility and negative comments towards the biological father."

{¶12} The most serious example of the mother's conduct was her claim that the child's stepmother had intentionally injured the child by dragging her by the ankle. The stepmother denied the allegations, and the West Virginia guardian ad litem assigned to investigate the case found no basis for concluding that the child had suffered any injury as a result of mistreatment by the father or the stepmother. Addressing the mother's allegations, the court found that the child might have suffered an injury, but of the two different explanations offered by the opposing parties, the stepmother's explanation "was not unreasonable or suspicious" while the mother's explanation "could not be substantiated." The court found that the allegation against the stepmother "was overblown and exploited by the mother," that it created "another barrier to the father's parenting time," and that the mother used her allegations to "minimize or eliminate mother's obligations to provide contact between the child and father."

{¶13} The mother received her information about alleged abuse from the child. But the child's veracity was dubious — the West Virginia guardian ad litem noted that the child had a "vivid imagination," a conclusion that even the mother was forced to concede during her testimony at the hearing. In fact, during her interview with the West Virginia

guardian ad litem, the child claimed that, a day earlier, the mother had thrown a lamp at her husband and that, two weeks earlier, she claimed that "mommy said she was going to drive her car off the bridge into the river." The West Virginia guardian ad litem thought the child's imagination made it "difficult to determine fact from fiction," but said that "[i]f anything, the allegations she was making about [the mother] were more troubling that [sic] those made against [the stepmother][.]"

{¶14} Regardless of whether the child could be believed, the evidence showed that the mother harbored great animosity toward the stepmother, making unprovoked comments in front of the child that the stepmother was a "slut" and a "whore." This animosity caused the mother to latch onto any statement by the child that might paint the father and stepmother in a poor light. For example, the mother claimed that the father had locked the child in a closet, but the West Virginia guardian ad litem found it "apparent" that the father and child had been playing "hide and seek." The mother admitted that the child "makes up stories all the time." But instead of determining the veracity of the child's statements, no matter how incredible they might be, given the child's history of fabricating stories, the mother used them against the father in her attempt to harm his relationship with the child.

{¶15} We could go on with more facts from the record, but to do so would be redundant. The court did not expressly state that there was a change in circumstances, but no other finding could rationally be supported on the record. Indeed, the court proceeded to analyze the case solely on whether the child's best interest warranted a

modification of custody. The overwhelming evidence showed that the mother intentionally interfered with the father's visitation rights, so the father established a change in circumstances for purposes of R.C. 3109.04(E)(1)(a).

### III

{¶16} In order to establish the best interest of the child, the court is required to consider all relevant factors, including those set forth in R.C. 3109.04(F). Among those factors are "[t]he parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights," and "[w]hether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court[.]" R.C. 3109.04(F)(1)(f) and (I).

### A

{¶17} Our recitation of the court's findings relative to the mother's repeated interference with the father's visitation rights applies equally to the determination of the child's best interest. Given the basic proposition that, apart from truly exceptional cases, it is in a child's best interest to have a strong relationship with both parents, the mother's repeated interference with the father's visitation rights was a prior act that was not in the child's best interest. She moreover gave no indication that she would cease her conduct if allowed to remain the residential parent.

{¶18} The mother's repeated attempts to interfere with the father's visitation was a factor under R.C. 3109.04(F)(1)(h). Apart from that, the court found that:

Both parents provide appropriate care; however, they nurture the child differently according to the roles they play in the child's life, to wit: mother and father. At times, father appears to be more cooperative, provide more appropriate care and nurturing, particularly during periods of high parental conflict. The Court finds that most significantly, mother has and continues to be the primary caretaker of the child; the child has special needs and mother has engaged medical service providers, and monitors her needs closely. While father has the same concern for the child's needs, but as active military, father does not have a permanent residence and much of the child's care may fall to her step mother relating to father's work hours, inaccessibility, or change in orders or duty station. Mother provides a stable, permanent residence for the child and her family, and the child has been substantially integrated into the home, school and community settings, including medical specialists.

{¶19} The father contests some of these findings; for example, that the child has "special needs." The court did not state what those special needs were and our review of the record fails to show any mental or physical condition of the child that would warrant that characterization. As the term "special needs" is commonly used, it implies a child with an identified disability, health, or mental health condition requiring intervention, special education services, or other specialized services and support.

{¶20} The child is asthmatic and takes medication to control that condition. While many medical conditions undeniably constitute a special need, there was nothing in the record to suggest that the child's asthma was so severe that the father would be unable to deal with it as effectively as the mother. The court made no findings specific to the father's ability to care for the child's asthma, but the findings it did make regarding each parent's ability to care for the child showed that "[e]ach parent provides an appropriate level of care and supervision of the child[.]"

**{¶21}** There were also concerns for the child's weight — medical records showed that she was in the 99th percentile for her age. The court gave no indication that it believed the child's weight to be a "special need." It did order the parties to "refer the child to a dietician and follow the recommendations of the evaluator during all parenting times." The court did not say that the mother was better able to deal with the child's weight problem nor would that conclusion be reasonable on the record before us. To the extent that either parent bore responsibility for the weight issues of an eight-year-old child, that responsibility would necessarily lie with the mother, with whom the child resides and who controls most aspects of the child's daily care. But even if no blame is assessed for the child's physical condition, there is nothing in the record to suggest that the child's best interests were better accommodated by the mother's ability to provide for the child's medical or dietary needs.

B

**{¶22}** The court was also concerned with the father's ability to establish a permanent residence given his active service in the military. This was presumably a factor under R.C. 3109.04(F)(1)(d) going to the child's adjustment to home, school, and community. The father is currently stationed at Marine Corps Base Quantico and attends the Marine Corps War College. This is a non-deployable billet for the duration of his studies, which he anticipates will run for at least three years. Upon the completion of his studies, he will likely be posted to one of three locations: Camp Lejeune, North Carolina; Camp Pendleton, California; or a Marine Corps base in Hawaii.

**{¶23}** While the court was rightly concerned with permanency of residence as a factor going to the best interest determination, there was nothing in the record to suggest that the father's living arrangements were not "permanent" or that the child's relocation to Virginia would have a deleterious effect on her. The father did have permanent housing in Virginia, leading us to conclude that the court confused permanency of housing with the possibility of relocation. To the extent the father's military obligations might require relocation as his duty postings change, that fact alone cannot be determinative. It would be a considerable insult to those in the military service to suggest that their duty postings would be prima facie detrimental to children who live with them. The court found that much of the child's care might fall to the stepmother, but there was no evidence to support this conclusion. The father's position bears the risk that he could be deployed into combat, but there was no evidence that he was subject to further combat deployment at this time. The court's conclusions about the permanency of the father's housing and his availability to the child lacked any basis in fact.

C

**{¶24}** We review a court's determination of the best interest of a child for an abuse of discretion. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). The court's discretion is not unlimited, however, and a decision will be overturned as an abuse of discretion if it is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983); *Baxter v. Baxter*, 27 Ohio St.2d 168, 172-173, 271 N.E.2d 873 (1971).

**{¶25}** We cannot reconcile the court's many findings about the mother's misconduct toward the father with its conclusion that the child's best interests, nonetheless, dictate that she remain in the mother's custody. In reaching this conclusion, the court unreasonably disregarded its own finding that the mother being "mean, vindictive, and unforgiving" were "all to the detriment of the child." It is irrational for the court to find that the mother's interference with the father's visitations was detrimental to the child, but that it was still in the child's best interest to remain with her. The mother's behavior throughout this case was not isolated — it has occurred for several years and shows no sign of abating. She testified at trial that she did not have anger control problems, but explained her outbursts by saying that the father had the ability to find her "breaking point." However, the court ordered the mother to engage in anger management therapy.

**{¶26}** On the other hand, the court found that "[a]t times, father appears to be more cooperative, provide more appropriate care and nurturing, particularly during periods of high parental conflict." Unlike the mother, he was not ordered to engage in counseling "to address anger management, emotional stability and co-parenting." It is irrational for the court to conclude that the mother who so lacked emotional stability and parenting abilities that she was ordered to seek counseling to address those issues would provide a better parenting experience than the father who could provide more appropriate care and who, most importantly, would not interfere with the mother's visitation rights.

**{¶27}** In the end, the court found that both parents loved the child and were capable of caring for the child's needs. Against this were the mother's vindictiveness, anger, and outright fabrications against the father, all for the long-term purpose of impeding his rights to visit with his child. Additionally, the child's guardian ad litem recommended that the father be named the custodial parent.

**{¶28}** This case is very similar to *In re D.M.*, 196 Ohio App.3d 50, 2011-Ohio-3918, 962 N.E.2d 334 (12th Dist.), in which the Twelfth District Court of Appeals found that the juvenile division abused its discretion by granting custody of a child to a mother with a documented history of obstructing a father's parenting time. Although the Twelfth District found that both parents in that case "stand on an equal footing under several of the statutory factors in R.C. 3109.04(F)(1)[,]" *id.* at ¶ 31, it singled out the juvenile division's statement that the mother had "demonstrated repeatedly her unwillingness to not only cooperate with the father concerning his relationship and parenting time with the child, but her unwillingness to cooperate with this Court's Orders." *Id.* at ¶ 35. Finding the juvenile division's decision to terminate a shared parenting plan and grant custody to the mother an abuse of discretion, the Twelfth District reversed and remanded for further proceedings.

**{¶29}** We find no basis for distinguishing the facts of this case from *D.M.* and are compelled to conclude that this is the rare case where the court abused its discretion by denying the motion for a change of custody and keeping the child in the mother's custody. In reaching this conclusion, we stress that we are not substituting our judgment for that

of the court, but merely implementing the only judgment that could rationally follow from the court's own findings of fact. Those findings of fact overwhelmingly supported a finding of changed circumstances based on the mother's interference with the father's visitation. Moreover, the court's discussion of the best interest factors erroneously relied on a mischaracterization of the child's "special needs," engaged in improper speculation concerning the permanency of the father's living arrangements as an officer in the United States Marine Corps, and showed an absolute disregard for the consequences of the mother's conduct in interfering with the father's visitation and how that interference has undermined the child's relationship with her father.

{¶30} We are acutely aware that the child has only lived with the mother, but that fact alone cannot be a basis for affirming the court's refusal to change custody. The court found that the child has "adjusted to both homes and communities of the parents," so her relocation into the father's custody would not necessarily be traumatic. And the child's adjustment to the mother's home is not paramount over the child and father's right to a relationship free from harassment and interference by the mother. For us to hold otherwise would reward the mother's conduct of interfering with the father's visitation and deprive the child of a meaningful relationship with the father.

{¶31} Consistent with the judgment rendered in D.M., we sustain the first assignment of error. Our holding renders the remaining assignments of error moot. *See* App.R. 12(A)(1)(c).

**{¶32}** This cause is reversed and remanded for proceedings consistent with this opinion.

It is ordered that appellant recover of appellee his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas — Juvenile Division to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MELODY J. STEWART, PRESIDING JUDGE

COLLEEN CONWAY COONEY, J., CONCURS;
JAMES J. SWEENEY, J., CONCURS IN JUDGMENT ONLY