[Cite as *In re S.W.-S.*, 2013-Ohio-4823.]

IN THE COURT OF APPEALS FOR MIAMI COUNTY, OHIO

IN THE MATTER OF: S.W.-S.      :

     :      C.A. CASE NO.    2013 CA 17

     :      T.C. NO.    20830265

     :      (Civil appeal from Common
         Pleas Court, Juvenile Division)

     :

     :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___1st___ day of _____November_____, 2013.

. . . . . . . . . .

JEREMY M. TOMB, Atty. Reg. No. 0079664, 124 W. Main Street, Troy, Ohio 45373
     Attorney for Appellant

TODD D. SEVERT, Atty. Reg. No. 0060076, 18 East Water Street, Troy, Ohio 45373
     Attorney for Appellee

. . . . . . . . . .

FROELICH, J.

{¶ 1} J.F. ("Mother") appeals from a judgment of the Miami County Common Pleas Court, Juvenile Division, which named S.S. ("Father") as the residential and custodial parent of their daughter.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} Mother and Father were unmarried when their daughter was born in 2007.

Father established paternity and, in August 2008, Father filed a motion for parenting time. The parties appear to have come to an agreement whereby Father had visitation with the child and paid child support to Mother.[1] The parties reported the broad terms of their agreement to the court and, two weeks after the motion was filed, a magistrate entered a Memorandum of Proceedings, which generally indicated that the matter had been settled by agreement of the parties. The Memorandum stated that the parties were required to file an Agreed Entry reflecting their agreement, but they did not do so. In October 2008, the magistrate filed a decision and entry noting that the time for filing the agreed entry had passed and dismissing Father's motion for parenting time. Neither party objected to this action in the trial court or by filing a notice of appeal.

{¶ 4}     In February 2012, Father filed a Motion to Allocate Parental Rights and Responsibilities, requesting that he be named the residential and custodial parent. As bases for the award of custody to Father, the motion cited Mother's intent to relocate to Hawaii with the child, her third engagement within two years, and her "nomadic lifestyle". The trial court conducted a hearing on this and other motions in January 2013. After hearing the evidence, the court found that it was in the child's best interest to designate Father as the residential and custodial parent and awarded parenting time to Mother, the specifics of which were dependent on whether she moved out of state.

{¶ 5}     Mother raises three assignments of error on appeal.

{¶ 6}     The first assignment of error states:

THE   2008   PARENTING   TIME   MOTION,   HEARING   AND

---

[1]The record does not contain all of the terms of the agreement.

ORDER, EITHER ACTUAL OR DE FACTO, BECAME A PRIOR ORDER OR DECREE OF THE COURT EFFECTING PARENTAL RIGHTS AND ALLOCATION OF PARENTING TIME REGARDING THE MINOR, THUS THIS SHOULD HAVE BEEN A REALLOCATION OF THOSE RIGHTS; NOT AN INITIAL ALLOCATION.

{¶ 7} Mother contends that the trial court should have addressed Father's motion as a request for a reallocation of parental rights, rather than an initial determination of parental rights, because of their 2008 agreement.

{¶ 8} To obtain a reallocation of parental rights, the movant must show a change of circumstances in the life of the child or the residential parent, that a change of custody is in the best interest of the child, and that the harm caused by the change of custody would be outweighed by its advantages. R.C. 3109.04(E). In an initial allocation of parental rights between unmarried parents, the court considers only the best interest of the child, and the father and mother "[stand] upon an equality." R.C. 3109.04(B)(1); R.C. 3109.042.

{¶ 9} First, Mother contends that the magistrate's August 8, 2008 memorandum of proceedings should be treated as an order of the court regarding the allocation of parental rights and responsibilities, such that the 2012 motion required a "reallocation."

{¶ 10} The 2008 memorandum was handwritten and contained a very abbreviated outline of the parties' agreement. It did not identify a residential or custodial parent, although Father's motion for parenting time supported the inference that Mother was intended to be the custodial parent. *See also* R.C. 3109.042. The memorandum stated: "1) Support per guidelines; 2) Alt. weekends and Thurs. overnights and SO for holidays; 3) Alt

dep ex - Father - 2008 + even / Mother odds. 2009; SOHC 50/50 on uninsureds." The memorandum further stated: "Filings Required: Agreed Entry."

{¶ 11}    Even if the most salient terms of the parties' agreement were decipherable from the memorandum, the memorandum did not include the degree of detail that one would expect to see in an order allocating parental rights. It also did not address the best interest of the child, as R.C. 3109.04(F) requires of an original decree allocating parental rights and responsibilities, and it was not signed by the parties or a judge. Moreover, the entry's requirement that the parties file an Agreed Entry, and the magistrate's subsequent dismissal of the "Motion for Parenting Time" due to the parties' failure to do so, supported the conclusion that the complete agreement was not embodied in the Memorandum of Proceedings. Thus, we disagree with Mother's assertion that the magistrate's Memorandum of Proceedings could have or should have been treated as an order allocating parental rights and responsibilities.

{¶ 12}    Mother also argues, alternatively, that the 2008 Memorandum of Proceedings was a de facto order allocating parental rights, if not an actual one, because "the parties, Guardian ad Litem, court and counsel for both sides" treated Mother as if she had been named the custodial parent, and the parties gave the agreement effect.

{¶ 13}    The parties may have abided by their understanding of their agreement between 2008 and 2012, although it was not formalized as a trial court judgment. However, their agreement and apparent cooperation during these years do not create a "de facto" court order adopting their agreement.

{¶ 14}    It is undisputed that Mother served as the child's residential parent prior to

Father's February 2012 Motion to Allocate Parental Rights and Responsibilities. This arrangement was in accordance with R.C. 3109.042, which states that "[a]n unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian." R.C. 3109.042 further provides, however, that when a court is called upon to designate the residential parent and legal custodian for such a child (born to an unmarried female), it "shall treat the mother and father as standing upon an equality when making the designation."

{¶ 15} Where a prior custody order exists, a trial court must find that a change of circumstances has occurred, as well as that the modification is in the best interest of the child, in order to modify the custody arrangement. R.C. 3109.04(E). If we were to recognize a "de facto" court order awarding custody to Mother under the circumstances presented in this case, where no such court order was in fact filed, we would undermine R.C. 3109.042, which expressly states that Father and Mother are on equal footing when a court makes an initial designation of the residential and custodial parent for that child.

{¶ 16} Finally, Mother argues that the trial court's 2013 order naming Father as the residential and custodial parent is "void as a matter of law" because the court should have treated Father's motion as a reallocation, rather than an initial allocation, of parental rights. For the reasons discussed above, we conclude that the trial court had not previously issued an order affecting the allocation of parental rights, and we reject Mother's claim that Father's 2012 motion should have been treated as a reallocation.

{¶ 17} Moreover, under Ohio law, there are generally "but two reasons that a

judgment is void: '[the judgment] has been imposed by a court that lacks subject-matter jurisdiction over the case or the authority to act.'" *Lamb v. Lamb*, 2d Dist. Montgomery No. 24076, 23538, 2011-Ohio-2970, ¶ 12, quoting *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, 884 N.E.2d 568, ¶ 12. Neither circumstance applies in this case. At most, the judgment was voidable, meaning that it was "rendered by a court that has both jurisdiction and authority to act, but the court's judgment is invalid, irregular, or erroneous." *State v. Parson*, 2d Dist. Montgomery No. 24641, 2012-Ohio-730, ¶ 8, citing *Simpkins* at ¶ 12. However, having found no error in the court's treatment of the 2012 motion as an initial custody determination, we conclude that the trial court's judgment is not voidable on that basis.

{¶ 18}    The first assignment of error is overruled.

{¶ 19}    The second assignment of error states:

MOTHER'S CONTEMPLATED MOVE WAS NOT ACTUAL AND WAS OVER-EMPHASIZED AND WEIGHED UNDER THE [R.C.] 3109.04(F) "BEST INTERESTS" TEST WHILE OTHER FACTORS WERE NOT WEIGHED OR GIVEN SUFFICIENT WEIGHT.

{¶ 20}    Mother argues that the trial court abused its discretion in weighing the factors relevant to the child's best interest as it did.

{¶ 21}    R.C. 3109.04(F)(1) provides a list of factors to be used when a court considers the best interest of a child in determining parental rights. These factors include: (a) the parents' wishes; (b) the child's wishes, if the court has interviewed the child; (c) the child's interaction with parents, siblings, and others who may significantly affect the child's

best interests; (d) adjustment of the child to home, school, and community; (e) the mental and physical health of all involved persons; (f) which parent is more likely to honor parenting time rights; (g) any failure to make child support payments, including arrearages; (h) any prior convictions involving abuse, neglect, or sexually oriented offenses involving family members: (i) conscious and willful denial of the other parent's right to court-ordered parenting time; and (j) whether either parent has established a residence or plans to establish a residence outside the state. Other relevant factors may also be considered.

{¶ 22} We review a court's determination of the best interest of a child for an abuse of discretion. *Brown v. Brown*, 2d Dist. Champaign No. 2012-CA-40, 2013-Ohio-3456, ¶ 12.

{¶ 23} At the hearing on Father's motion for custody, the guardian ad litem testified that both parents loved and took good care of the child, and that Mother had been the primary caregiver since the child's birth. Each parent provided an adequate home for the child. Mother had another young child from a previous relationship and was expecting a new baby (with her husband) at the time of the hearing.

{¶ 24} The guardian ad litem observed that mother's history of short-term relationships and her decision-making with respect to her marriage and anticipated move to Hawaii were "self-centered," "short-sighted," and "selfish." Mother had known her husband only a few months when they were married, during which time they were not in the same city; the child had interacted with Mother's husband only a few times before the marriage, giving her little time to adjust to the marriage or to his presence in her life.

{¶ 25} The guardian ad litem stated that the child had a close relationship with

both parents, as well as extended family of both sides of the family, which would be negatively affected by a move to Hawaii or other military installations. He characterized the move to Hawaii as a "forthcoming change of circumstances" and stated his opinion that the risk of harm to the child from moving to Hawaii (and/or other locations) with Mother, leaving behind a loving father and extended family, was greater than the harm that would be caused by transferring custody to Father and keeping the child in Ohio. The guardian ad litem believed that Mother had not weighed the possible adverse effect of the marriage to a military member and the moves often characteristic of such service on the child before proceeding with the marriage.

{¶ 26}   Father testified that he and Mother had an on-and-off relationship for several years, and that their relationship ended most recently just a few months before her marriage to her current husband.  However, they had not lived together since the child's birth.  From the child's birth until he filed his 2012 motion for custody, Father had visited with the child overnight every Thursday and from Thursday evening until Sunday every other week.  He testified that all of his family lived within 30 miles and that the child had a good, close relationship with Father's parents, her cousins, and other relatives. The   paternal grandparents and an aunt who is a foster parent provide childcare, as necessary, when he is working.

{¶ 27}   Father expressed concern about the short amount of time that Mother knew her new husband before marrying him.  Father first learned about the marriage and about the impending move to Hawaii from his daughter.  Father testified that Mother has "a tendency to rush relationships," had been engaged multiple times, had introduced their

daughter to numerous boyfriends over a period of three or four years, and had lived with several of them. He also stated that she had been fired from at least two jobs during their time together. Mother reduced Father's parenting time when he filed for custody. Father did not request child support and offered generous visitation with Mother in the summer and at holidays if he were awarded custody.

{¶ 28} Mother disputed many of Father's claims about her past "rushed" relationships and changes in employment. She also testified that Father has not been involved in many aspects of their daughter's life, such as her medical care and activities at her preschool. Mother testified about her own close relationship with the child and the closeness between the child and Mother's other daughter. Mother testified that she wanted to have her family, including her new baby, live together in Hawaii, where her new husband's career is based. She testified, however, that if she did not retain custody of her daughter, she would not move to Hawaii.

{¶ 29} Mother described meeting her new husband, D.F., in Dayton in September 2011, when they talked for a few hours at a bar; he was in town for the Air Force Marathon. They kept in touch through phone and text, and met for another date in October 2011 when D.F. was on leave in Pennsylvania. D.F. came to Dayton for approximately a week at Christmas, and it was at this time that he met Mother's daughters for the first time. The couple married on their next visit in March 2012.

{¶ 30} D.F. also testified that he and Mother knew each other for six months when they were married, although most of that time had been spent in separate cities. D.F. was aware of Father's allegations that Mother was promiscuous but, after talking with her, he

was not concerned about and/or did not credit those allegations. He testified that Father used curse words toward Mother and in the presence of the children during an exchange for visitation that he witnessed. D.F. testified that he expects to remain in Hawaii and not be deployed elsewhere.

{¶ 31} A few relatives of Mother and Father testified about the close relationship of the respective parents with the child and of observations critical of the other parent. They also disputed some conclusions contained in the guardian ad litem's report.

{¶ 32} In its decision, the trial court stated that the child was "actively integrated" with relatives on both sides of the family and was well-adjusted in both homes, at school, and in the community. Based on the in camera interview, the court determined that the child was "too young to determine her wishes," but that she clearly loved both parents and wanted to be with both of them. The court also observed that Father had lost his temper with Mother in the past, that Mother married D.F. after a brief period of time, and that D.F. had spent "limited time" with Mother's children. Based on the guardian ad litem's report, it appeared that Father would provide "more frequent and extended visitation access" than Mother. The court noted that "non-residency" of one parent is a valid consideration in the best interest of a child, but that a parent cannot be deprived of custody on that basis alone.

{¶ 33} Based on these observations, the trial court concluded that "it is in the best interest of [the child] that she remain in Ohio and that [Father] is named the primary residential custodian." The trial court named Father the residential and custodial parent regardless of whether Mother moved, but the court provided that parenting time would be determined based on whether Mother was living in-state or out-of-state.

{¶ 34} Due to Mother's recent marriage to D.F., she planned to move to Hawaii, but she stated at the hearing that she would not go if she did not have custody of her daughter. In her brief, Mother claims that "an anticipated move" should not have been given undue weight by the court in the best interest analysis.

{¶ 35} Although the exact location of a service member's deployment and/or station may only be "anticipated," D.F. testified that his "unit doesn't deploy," and that due to the "voluntary" nature of his assignment, he did not expect to move from Hawaii. Moreover, Mother was expecting a baby with her new husband, such that failure to move would result in the separation of another child from one of that child's parents. The trial court could have reasonably concluded that Mother planned to move, although the move was not yet completed, and that there was little chance that D.F. would be deployed to Ohio or elsewhere. Thus, the "anticipated move" was one legitimate consideration in the trial court's decision.

{¶ 36} The court considered Mother's choice to move, along with other factors, in reaching its conclusion to name Father as the residential and custodial parent; Mother's intent to move was not the only factor. The court's decision demonstrates that the move was not given "undue" weight, as Mother contends, because the court awarded custody to Father even if Mother does not move. The planned move to Hawaii seems to have been indicative, to the court, of Mother's willingness to prioritize her own desires and lifestyle choices over the best interest of the child. Mother did not seek the court's approval to move or consult with Father prior to marrying and becoming pregnant with the child of a man who lives in Hawaii and whose employment is likely to keep him there for the foreseeable future.

{¶ 37}    In discussing this situation, the trial court did not suggest (and we do not suggest) that the military obligations of a parent or a step-parent should have an adverse effect on or be determinative of parenting arrangements.   As the Eighth Appellate District has noted, "[i]t would be a considerable insult to those in the military service to suggest that their duty postings would be prima facie detrimental to children who live with them."   *In re S.M.T.*, 8th Dist. Cuyahoga No. 97181, 2012-Ohio-1745, ¶ 23.   Here, neither biological parent was active in the military.   The court's concern was with Mother's willingness to uproot her child and significantly alter the child's ability to maintain a relationship with Father in order to continue a relationship with a man that Mother had known for a short period and had seen only a few times.   The court's decision does not suggest that it considered a parent's or spouse's military service, in itself, to be detrimental to a child or to be a significant consideration in a custody determination.

{¶ 38}    Moreover, in the court's view, Father was more likely, as a custodial parent, to facilitate generous visitation with Mother. Father's housing and employment had been more stable.   Both parties provided appropriate homes to which the child was well-adjusted, and the court recognized some elements of the personality of each parent that caused some concern or conflict.   Father admitted using marijuana on New Year's Eve 2011, but no evidence was presented that he was caring for the child at that time.   On the whole, we cannot conclude that the trial court abused its discretion in weighing the factors relevant to the best interest of the child as it did.

{¶ 39}    The second assignment of error is overruled.

**{¶ 40}** The third assignment of error states:

THERE ARE GROUNDS TO VACATE AND REMAND THE DECISION BASED ON ERROR BECAUSE THE JUDGE DEEMED THE MINOR INCOMPETENT TO EXPRESS HER WISHES, YET STATED HER WISHES IN THE "BEST INTERESTS" TEST AND REFERENCED THEM AS PART OF THE DECISION.

**{¶ 41}** Mother contends that the trial court erred in finding that the child was incompetent to express her wishes and then relying on those wishes in its decision.

**{¶ 42}** During the in camera interview with the parties' daughter, the child expressed that she had talked with each of her parents about the court proceedings and her understanding that "I gotta figure out who I'm gonna live with." She was able to describe, in very general terms, the current custody arrangement of spending most of her time with Mother and less time with Father. She stated that she loved both parents and acknowledged that, in conversations with her counselor, she has gone "back and forth" about the parent with whom she would like to live. She wished her parents were still together and stated that she would like to live with both of them.

**{¶ 43}** In its decision, the trial court listed the factors set forth in R.C. 3109.04(F)(1) as relevant to determining the best interest of a child; these factors include the wishes and concerns of the child, as expressed to the court. R.C. 3109.04(A)(1)(b). In its discussion of this factor, the court stated: "The child was too young to determine her wishes during the in-camera interview, but she did make clear that she loved both her parents and wanted to live with them." (Emphasis sic.) The court also commented that, the child, who

was five years old at the time of these proceedings, "was not able (in the court's opinion) to add much to this decision or her choice," but that she wanted to live with both parents.

{¶ 44} The court's comments in its Journal Entry about the child's feelings and the weight to be given to her input were reasonable under the circumstances presented. There was no need for or benefit to be derived from a finding by the court that the child "lacked the ability to contribute competently" to the proceedings because of her age, as Mother suggests. In essence, the child expressed no preference between the parents, but expressed a desire to see and live with both of them. We see no harm in the trial court's minimal consideration of these feelings, which it acknowledged were not particularly helpful to the court in rendering its decision. The court did not "improperly attribute" emphasis to the child's wishes, as Mother suggests.

{¶ 45} The third assignment of error is overruled.

{¶ 46} The judgment of the trial court will be affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Jeremy M. Tomb
Todd D. Severt
Hon. W. McGregor Dixon, Jr.